UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,
P.O. Box D
Fort Yates, ND 58538,

Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,
441 G Street NW,
Washington, D.C. 20314-1000;

ADAM R. TELLE, in his official capacity as Assistant Secretary of the Army (Civil Works),
108 Army Pentagon,
Washington, D.C. 20310-0108;

JOSEPH M. SAHL, in his official capacity as Commander, U.S. Army Corps of Engineers, Omaha District,
1616 Capitol Avenue,
Omaha, NE 68102-4901;

U.S. PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION,
1200 New Jersey Avenue SE,
Washington, D.C. 20590; and

PAUL J. ROBERTI, in his official capacity as Administrator, U.S. Pipeline and Hazardous Materials Safety Administration,
1200 New Jersey Avenue SE,
Washington, D.C. 20590,

Defendants.

Case No. _____________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Comes now the Standing Rock Sioux Tribe, and for its Complaint alleges as follows:

## INTRODUCTION

1. Plaintiff Standing Rock Sioux Tribe (the "Tribe") brings this action to shut down the Dakota Access Pipeline ("DAPL"). The Tribe seeks vacatur of the May 21, 2026, Record of Decision ("ROD") by which defendant U.S. Army Corps of Engineers (the "Corps") approved the issuance of a new 25-year easement for DAPL to cross the federal flood control project at Lake Oahe; an order setting aside the facility response plan approvals of defendant Pipeline and Hazardous Materials Safety Administration ("PHMSA"); and declaratory and injunctive relief, including an order enjoining the pipeline's continued operation. The ROD is arbitrary and capricious, an abuse of discretion, and contrary to law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

2. On December 19, 2025, the Corps released the *Dakota Access Pipeline Lake Oahe Crossing Project Final Environmental Impact Statement* ("FEIS"). On May 21, 2026, the Corps issued the ROD, approving the issuance of a second easement for DAPL to Dakota Access, LLC ("Dakota Access") at Lake Oahe for a term of 25 years, at a flow rate of 1.1 million barrels per day ("bpd") — nearly double the 570,000 bpd capacity at which the pipeline was originally authorized.

https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/28531 (FEIS).

https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/29126 (ROD).

3. DAPL is a 1,174-mile crude oil pipeline extending from the Bakken oil fields of western North Dakota to Illinois. It crosses beneath Lake Oahe one-half mile upstream from the Standing Rock Indian Reservation and its Cannon Ball community, through the Tribe's unceded Treaty lands. *See* Treaty of Fort Laramie of April 29, 1868, arts. 11, 16, 15 Stat. 635;

Map of Sioux Nation Treaty Lands under 1851 and 1868 Fort Laramie Treaties.




4. The Missouri River at Lake Oahe is the Tribe's primary source of drinking water, the center of its subsistence fishing and hunting economy, and a place of profound religious and cultural significance.

5. The Lakota and Dakota people of the Standing Rock Sioux Tribe understand water as the first medicine, reflecting that we are nurtured in the womb in water. The Lakota phrase associated with Indigenous opposition to DAPL, *mní wičóni*, means "water of life" or

"water is life." The cultural and spiritual significance of water motivates this legal action by the Tribe.

6. This Court has been here before. In 2020, this Court held that the Corps' original environmental review of the Lake Oahe crossing left "serious and unresolved" expert controversy over DAPL's leak-detection capabilities, the operator's safety record, oil recovery under winter ice, and the calculation of the worst case discharge, and ordered the Corps to prepare an environmental impact statement. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 17–21 (D.D.C. 2020). The Court subsequently vacated the pipeline's easement. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 471 F. Supp. 3d 71 (D.D.C. 2020). The D.C. Circuit affirmed both rulings, while allowing the pipeline to continue operating during the remand. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021).

7. Six years later, the Corps has produced a Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") that do not resolve the controversies that required the EIS. The worst case discharge calculation still rests on a detection-and-shutdown assumption contradicted by the operator's own documented record. The FEIS's risk rankings rest on a methodology that the very authority the Corps cited has withdrawn — a defect the Corps never addressed despite repeated comments. The Corps estimated the probability of a spill at Lake Oahe from industry-wide statistics rather than from the record of DAPL's own operator — the worst among comparable hazardous liquid pipeline operators in PHMSA's own database, and never meaningfully confronted that record. And neither the FEIS nor the ROD demonstrates that oil can be contained and recovered from Lake Oahe: the operator has not identified and ensured the access, resources, personnel, equipment, and planning necessary to respond within the

applicable response times to a worst case discharge "to the maximum extent practicable," particularly under the low-water and ice-covered conditions that now prevail for much of every year.

8. The pipeline the ROD approves is materially different in many respects from the one this Court considered. The ROD nearly doubles DAPL's throughput to 1.1 million bpd. The reservoir itself has changed: since 2021, drought has repeatedly drawn Lake Oahe down to elevations at which the boat ramps and control points identified in the spill response plans sit on dewatered mud flats, rendering them unusable. Before the ROD issued, the operator publicly announced plans to transport approximately 250,000 bpd of Canadian crude through DAPL — a hazardous liquid product that, when released, would submerge or sink, defeating the surface-collection response methods on which the Corps' entire spill analysis depends. The Corps deferred any analysis of that change to a future easement condition, even though Energy Transfer informed its shareholders that the transport of Canadian crude in DAPL is an option to meet the higher rate of flow approved in the ROD.

9. Independent statutory violations also barred the approval. On September 3, 2016 — the day after the Tribe filed and served a declaration identifying burials and sacred sites in the pipeline's path — the operator's contractors moved their equipment directly to the identified area and destroyed the sites. Under section 110(k) of the National Historic Preservation Act ("NHPA"), an applicant that intentionally destroys historic properties to circumvent review is ineligible for federal assistance unless the agency, after consultation with the Advisory Council on Historic Preservation, determines that circumstances justify the grant. 54 U.S.C. § 306113. The Corps has been on notice of these facts for nearly a decade. It issued the ROD without conducting any investigation, making any determination, or consulting the Advisory Council.

10. The pipeline's federally required emergency response planning is equally deficient. Under section 311(j)(5) of the Clean Water Act ("CWA"), DAPL may lawfully operate only under a facility response plan that provides for response to a worst case discharge "to the maximum extent practicable." 33 U.S.C. § 1321(j)(5). PHMSA approved response plans for DAPL in 2017 and 2023 that materially understate the worst case discharge, rely on access and control points that are unusable during the low-water conditions that have prevailed since 2021, make no realistic provision for oil recovery during the four months of annual ice cover, and were developed without any consultation with the Tribe's emergency management authorities — the government that would supervise cleanup of any spill reaching the Reservation. Because a facility may not handle or transport oil except under an approved plan with which it is in compliance, *id.* § 1321(j)(5)(F), the Tribe seeks immediate, interim relief from DAPL's continued operation pending approval of a plan that complies with the Act.

11. The banks and mud flats of Lake Oahe in the oil spill response zone hold the graves of the Tribe's ancestors. When the Corps flooded the Tribe's bottomlands to form Lake Oahe, it failed to carry out the cemetery relocations Congress required, leaving thousands of cultural resources and human remains deposited in the banks of the reservoir at and around the DAPL crossing. 72 Stat. 1762. The response plans the defendants have approved prescribe excavation, berming, staging, and heavy-equipment operation on exactly those banks and flats. Yet the Corps excluded the response zone from its review under NHPA section 106, 54 U.S.C. § 306108, and neither the ROD nor the response plans contain any plan of action, consultation protocol, or protective procedure under the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 *et seq.*, and its implementing regulations, 43 C.F.R. Part 10,

for the human remains and cultural items that response operations would foreseeably expose, disturb, or destroy.

12. The Corps' decision also violates the Mineral Leasing Act ("MLA"), which conditions any easement on stipulations protecting water quality, the environment, and the subsistence resources on which area residents depend. 30 U.S.C. § 185(h)(2). The ROD makes no adequate findings concerning subsistence habitat in the spill zone or the Tribe's reserved water rights; its own conditions defer the necessary baseline studies until after the decision.

13. The Tribe files this action to require the defendant agencies to respect the Treaty rights and sovereignty of the Tribe and to protect the waters of the Missouri River and the ancestors resting at the water's edge. Throughout six years of court-ordered review, the Corps treated Nation-to-Nation consultation as an afterthought: Tribal leaders learned of the release of both the FEIS and the ROD from news reports, not from the United States. The Corps' findings in the FEIS and ROD are arbitrary and capricious within the meaning of the APA, and the decision to approve a new 25-year easement is contrary to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the NHPA, NAGPRA, the MLA, and the CWA. The Tribe therefore seeks vacatur of the ROD; an order setting aside PHMSA's response-plan approvals; and declaratory and injunctive relief — including the shutdown of a pipeline that operated with no easement at all for nearly six years and operates today without lawful spill planning — to prevent irreparable environmental, cultural, spiritual, and economic harm to the Tribe.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1362 (actions brought by Indian tribes with a governing body duly recognized by the Secretary of the Interior in which the matter in controversy arises under the Constitution, laws, or

treaties of the United States). This action arises under the APA, 5 U.S.C. §§ 701–706, which authorizes a federal court to hold unlawful and set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and to compel agency action unlawfully withheld. *Id.* § 706. This Court is further authorized to issue a writ of mandamus under 28 U.S.C. § 1361, declaratory relief under 28 U.S.C. § 2201, and further necessary or proper relief under 28 U.S.C. § 2202.

15. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because defendants are agencies and officers of the United States residing in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

16. Plaintiff Standing Rock Sioux Tribe is a sovereign Tribal Nation, recognized as such by the Secretary of the Interior. *See* 91 Fed. Reg. 4102 (Jan. 30, 2026). The Tribe's nationhood and sovereignty were long recognized by the expanding U.S. government, and its government-to-government relationship solidified with the Treaty of Fort Laramie of September 17, 1851, 11 Stat. 749. The Tribe resides on the Standing Rock Indian Reservation in present-day North Dakota and South Dakota. The primary address of the Tribal government is P.O. Box D, Fort Yates, North Dakota 58538.

17. Defendant U.S. Army Corps of Engineers is a branch of the U.S. Department of the Army, headquartered at 441 G Street NW, Washington, D.C. 20314-1000. The Corps manages the federal flood control project at Lake Oahe and issued the Record of Decision challenged herein authorizing the easement.

18. Defendant Adam R. Telle is the Assistant Secretary of the Army for Civil Works, the civilian authority that supervises the Army Corps of Engineers, sued in his official capacity. His address is 108 Army Pentagon, Washington, D.C. 20310-0108.

19. Defendant Joseph M. Sahl is the District Commander of the Corps' Omaha District, which oversees Lake Oahe and the other upper Missouri River Basin projects, sued in his official capacity. Defendant Sahl's predecessor, Robert J. Newbauer, is the signatory of the ROD. Mr. Sahl's address is 1616 Capitol Avenue, Omaha, Nebraska 68102-4901.

20. Defendant Pipeline and Hazardous Materials Safety Administration ("PHMSA") is an agency of the U.S. Department of Transportation, headquartered at 1200 New Jersey Avenue SE, Washington, D.C. 20590. PHMSA reviews and approves facility response plans for onshore oil pipelines and administers the federal pipeline safety laws.

21. Defendant Paul J. Roberti is the Administrator of PHMSA, sued in his official capacity as the official responsible for implementation of the Pipeline Safety Act and for review and approval of facility response plans under section 311(j)(5) of the Clean Water Act. His address is 1200 New Jersey Avenue SE, Washington, D.C. 20590.

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Administrative Procedure Act

22. The Administrative Procedure Act, 5 U.S.C. §§ 701–706, provides for judicial review of final agency action. A person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," is entitled to judicial review, and the United States has waived its sovereign immunity for actions seeking relief other than money damages. 5 U.S.C. § 702. "[F]inal agency action for which there is no other adequate remedy in a court" is subject to review. *Id.* § 704.

23. Upon review, the court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The reviewing court "shall" also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

24. The Corps' Record of Decision authorizing a new easement, and PHMSA's approvals of the facility response plans for DAPL, each constitute final agency action within the meaning of 5 U.S.C. § 704. Where, as alleged herein, an agency has failed to take a discrete action required by law — including the investigation, determination, and consultation required by NHPA § 110(k); the consultation and plan of action required by NAGPRA; and the review and approval of a statutorily compliant facility response plan — that failure is agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1).

**B. The National Environmental Policy Act**

25. Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment" and to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

26. For every "major Federal action significantly affecting the quality of the human environment," NEPA requires the acting agency to prepare a detailed statement — an environmental impact statement — addressing, among other things, the reasonably foreseeable environmental effects of the proposed action, any adverse environmental effects which cannot be avoided, and a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C).

27. NEPA's mandate is essentially procedural, but its procedures are demanding: the agency must take a "hard look" at the environmental consequences of its action before acting; must ensure the professional integrity and scientific accuracy of its analysis; must disclose and respond to responsible opposing scientific and technical viewpoints; and must evaluate significant new circumstances or information relevant to environmental concerns arising before the agency acts. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Marsh v. Or. Nat. Res. Council* , 490 U.S. 360, 374 (1989); *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971). This Court and the D.C. Circuit applied these principles to this very crossing, holding that the Corps' 2016 environmental review failed to resolve serious and unresolved expert controversy concerning DAPL's leak-detection system, operator safety record, winter-conditions response, and worst case discharge calculation. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 17–21 (D.D.C. 2020), *aff'd*, 985 F.3d 1032 (D.C. Cir. 2021).

28. The FEIS challenged here was prepared from 2020 through 2025 under the Council on Environmental Quality's 1978 regulations implementing NEPA, 40 C.F.R. §§ 1500–1508, and the Corps' and the Army's NEPA procedures then in effect. 33 C.F.R. § 230; ER 200-2-2. Although the Corps rescinded its NEPA regulations on July 3, 2025, the rescission expressly provides that ongoing actions as of that date would continue under the rules previously in effect. The Corps accordingly confirmed in the ROD that the FEIS and ROD are based on the 1978 CEQ NEPA regulations and prior Corps NEPA regulations. ROD at 2, n.5; 90 Fed. Reg. 29463 (July 3, 2025). Those regulations require compliance with NEPA before any approval or issuance of an easement or other realty outgrant on lands the Corps manages. 32 C.F.R. § 651.10(i) (2025).

**C. The Mineral Leasing Act**

29. The Corps manages the federal flood control project at Lake Oahe, including the federal land surrounding the mouth of the Cannonball River beneath which DAPL crosses. *See ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 499 (1988).

30. Section 28 of the Mineral Leasing Act of 1920 ("MLA") governs rights-of-way for oil and gas pipelines crossing federally managed lands. 30 U.S.C. § 185(a). Pipelines crossing such lands require a federal right-of-way authorizing the construction, operation, and maintenance of the pipeline. *Id.* While the granting of an easement is committed to the agency's judgment, a valid easement is mandatory for pipeline operation on federal land.

31. The MLA further imposes non discretionary duties on the granting agency. The agency must comply with NEPA before granting an easement. 30 U.S.C. § 185(h)(1). Further, any rights-of-way granted must contain stipulations that protect water quality, *id.* § 185(h)(2)(B); prevent damage to the environment, *id.* § 185(h)(2)(C); and protect "the interests of individuals living in the general area . . . who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes," *id.* § 185(h)(2)(D). Rights-of-way must also "be limited to a reasonable term" in light of the circumstances concerning the project and may not exceed thirty years. *Id.* § 185(n).

32. The Corps' regulations governing flood control project lands also prohibit unauthorized structures on project lands. 36 C.F.R. § 327; 36 C.F.R. § 327.20. In addition, Corps' procedures governing civil works projects further require NEPA compliance before issuance of a realty outgrant such as a pipeline easement. *See* ER 200-2-2, app. F; *see also* 32 C.F.R. § 651.10(i) (2025) (identifying leases, easements, permits, licenses and other entitlements for use as actions requiring environmental analysis).

**D. Tribal Consultation**

33. The United States' government-to-government relationship with the Standing Rock Sioux Tribe is grounded, in part, in the Fort Laramie Treaties of 1851 and 1868.

34. The 1851 and 1868 Fort Laramie Treaties recognized the Great Sioux Nation's relationship to a territory extending well beyond the boundaries of the present-day Standing Rock Indian Reservation. "Unceded" lands refer to lands that the Sioux Nation never relinquished to the United States through a treaty or agreement of cession. Article 16 of the 1868 Treaty expressly designated certain lands outside the Reservation as "unceded" and prohibited non-Indigenous settlement or occupation of those lands without the consent of the Sioux Nation. Treaty of Fort Laramie, Apr. 29, 1868, art. XVI, 15 Stat. 635, 636.

35. Article 5 of the 1868 Fort Laramie Treaty requires the United States to maintain an agent among the Tribe for the "prompt and diligent inquiry… by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations." Treaty of Fort Laramie, Apr. 29, 1868, 15 Stat. 635, 636.

36. Article 11 of the 1868 Treaty contains an explicit mandate for Tribal engagement on infrastructure projects like DAPL. It addresses federal "works of utility or necessity" through Treaty lands and requires the establishment of a commission—to include a Tribal head man—for assessing authorization and compensation for damages caused by such works. Treaty of Fort Laramie, Apr. 29, 1868, 15 Stat. 635, 636.

37. Executive Order 13175 further reinforces these obligations and establishes federal executive-branch policy concerning consultation and coordination with Tribal governments. Among other things, it directs federal agencies to respect Tribal sovereignty, honor treaty and other rights, and establish processes for meaningful and timely Tribal input: "The United States

continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, tribal trust resources, and Indian treaty and other rights…Agencies shall respect Indian tribal self-government and sovereignty, honor treaty rights and other rights… (and) ensure meaningful and timely input by tribal officials…" Exec. Order No. 13,175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67,249 (Nov. 9, 2000).

38. Pursuant to the government-to-government framework of E.O. 13175, the Corps adopted a Tribal Consultation Policy requiring: "Open, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect and shared responsibility…" and stating that "[C]onsultation works toward mutual consensus and begins at the earliest planning stages, before decisions are made and actions are taken." U.S. Army Corps of Eng'rs, Tribal Consultation Policy (2013), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf.

39. In addition to these government-to-government consultation policies, the NHPA requires consultation with Indian Tribes concerning historic properties of religious and cultural significance that may be affected by a federal undertaking. 54 U.S.C. §§ 302706(b), 306108; 36 C.F.R. § 800.2(c)(2). NAGPRA separately requires Tribal consultation in circumstances involving Native American human remains and cultural items on federal lands. *See* 25 U.S.C. § 3002; 43 C.F.R. Part 10. NEPA imposes separate procedural obligations requiring agencies to identify and assess environmental effects and to consider information and concerns presented by Tribes during the environmental-review process. *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission,* 896 F.3d 520, 525–26 (D.C. Cir. 2018). These statutory duties are

distinct from the broader government-to-government consultation framework described above and are addressed separately below.

40. The NHPA also requires that federal agencies consult with any "Indian tribe ... that attaches religious and cultural significance" to the sites, 54 U.S.C. § 302706(b). Consultation must provide the tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii). The Tribe, through its Historic Preservation Officer, must be involved in all three efforts: 1) identifying historic or cultural resources; 2) evaluating impacts on historic or cultural resources and those resources' eligibility for inclusion on the National Register of Historic Places ("NRHP"); and, 3) developing project alternatives or mitigation measures to protect those resources that are or may be eligible. As the D.C. Circuit confirmed, NEPA imposes a separate but closely related set of duties on federal agencies to identify and assess impacts to cultural resources when engaging in any permitting exercise, *Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 526 (D.C. Cir. 2018).

**E. The National Historic Preservation Act, §§ 106 and 110(k)**

41. "Congress enacted the National Historic Preservation Act ('NHPA') in 1966 to foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony." *CTIA—The Wireless Ass'n v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006) (citing 16 U.S.C. § 470-1(1), recodified at 54 U.S.C. § 300101). The NHPA has been characterized as a "stop, look, and listen" statute that requires agencies to fully consider the effects of their actions on historic, cultural, and sacred sites. *See, e.g., Te-Moak Tribe of Western*

*Shoshone Indians of Nevada v. U.S. Department of the Interior*, 608 F.3d 592, 606 (9th Cir. 2010). Section 106 of the NHPA requires that, prior to the issuance of any federal funding, permit, or license, agencies take into consideration the effects of that "undertaking" on historic properties. 54 U.S.C. § 306108. Agencies "must *complete* the section 106 process *prior* to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c) (emphasis added).

42. The NHPA also created the Advisory Council on Historic Preservation ("ACHP"), an independent agency charged with implementing the Act, as well as the National Register of Historic Places, the nation's official registry of historically and culturally important sites. 54 U.S.C. §§ 304101, 304102.

43. The Section 106 process requires consultation between agencies and Indian Tribes on federally funded or authorized undertakings that could affect sites that are on, or could be eligible for, listing in the National Register, including sites of traditional religious and cultural importance to Indian Tribes. 54 U.S.C. § 302706; 36 C.F.R. § 800.2(c)(2). "Consultation is the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the Section 106 process." 36 C.F.R. § 800.16(f). Consultation must occur regarding sites with religious and cultural significance to Tribes even where the sites are located on ancestral or ceded land outside Tribal boundaries. *Id.* § 800.2(c)(2)(ii)(D). The agency must "ensure" that the process provides Tribes "a reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of adverse effects,"

through "a reasonable and good faith effort" conducted "in a manner respectful of tribal sovereignty." *Id.* § 800.2(c)(2)(ii)(A), (B); *see also id.* § 800.3(f).

44. Section 106 consultation proceeds through a multi-step process. The threshold step is determination of the area of potential effects ("APE") of the federal undertaking — the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. §§ 800.4(a)(1), 800.16(d). The APE is determined by the scale and nature of the undertaking and "may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d). The agency must review existing information concerning known and potential historic properties within the APE, seek information from consulting parties and tribes, and make a reasonable and good-faith effort to identify historic properties. *Id.* § 800.4(a)-(b). The agency must then identify historic properties within the APE, evaluate their significance and National Register eligibility, assess the undertaking's potential effects upon them, and resolve adverse effects through consultation and mitigation. *Id.* §§ 800.4(b)–(c), 800.5, 800.6. At every step, the agency must consult with Indian Tribes that attach religious and cultural significance to affected sites. *Id.* §§ 800.2(c)(2)(ii)(D), 800.3(f), 800.4(a), 800.5(c)(2), 800.6.

45. The Corps has adopted procedures, set forth at Appendix C to 33 C.F.R. § 325, that it treats as satisfying its § 106 obligations. Those procedures have never been reviewed and approved by the ACHP as required for alternate agency procedures, 36 C.F.R. § 800.14(a), and courts and the ACHP have concluded that the Corps' Appendix C procedures are legally invalid. Courts have held that the Corps may not rely on Appendix C to avoid the requirements of the ACHP's Section 106 regulations where Appendix C is inconsistent with those requirements, and the ACHP has long maintained that the Corps' use of Appendix C falls short of Section 106 requirements. *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1437 (C.D. Cal. 1985)

("The distinction between properties and differing scopes of responsibility is at odds with NHPA and its regulation."); *Sayler Park Vill. Council v. U.S. Army Corps of Eng'rs,* No. C-1-02-832, 2002 WL 32191511, at *7 (S.D. Ohio Dec. 30, 2002) ("In a memorandum to its command staff, the Corps acknowledged that "[t]he ACHP does not endorse this guidance nor does it agree with Appendix C."); *Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs*, 163 F. Supp. 2d 776, 791-92 (N.D. Ohio 2001) ("to the extent the Corps' regulations allow it to issue a permit in the absence of the formal consultation, notification and objection procedures outlined in the ACHP regulations, the Corps' procedures are inconsistent with, and indeed, in derogation of those ACHP regulations.").

46. Section 110(k) of the NHPA prohibits a federal agency from granting "a loan, loan guarantee, permit, license, or other assistance" to an applicant that, "with intent to avoid the requirements of" Section 106, "has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed significant adverse effect to occur," unless the agency, "after consultation with the [Advisory] Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant." 54 U.S.C. § 306113. Section 110(k) thus renders an applicant that has engaged in intentional anticipatory demolition ineligible for federal assistance relating to the affected property; the statute's sole pathway to assistance notwithstanding such conduct is an agency determination, made after consultation with the ACHP, that circumstances justify the grant.

47. Indigenous sacred sites are entitled to additional procedural protections under Executive Order 13007, which requires federal land managers to adopt procedures to ensure

access to and protect the physical integrity of sacred and ceremonial sites. 61 Fed. Reg. 26771 (May 28, 1996).

**F. The Native American Graves Protection and Repatriation Act**

48. Congress enacted the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 *et seq.*, to protect Native American burial grounds — along with the remains and items buried there pursuant to tribal tradition — from excavation and disturbance, and to remedy a history of federal exploitation of Native American remains and cultural items. *See Thorpe v. Borough of Thorpe*, 770 F.3d 255, 260 (3d Cir. 2014); *Winnebago Tribe of Nebraska v. U.S. Department of the Army*, 175 F.4th 529, 532 (4th Cir. 2026).

49. NAGPRA applies on "Federal lands," defined as lands "controlled or owned by the United States," other than Tribal lands. 25 U.S.C. § 3001(5). The lands comprising the Lake Oahe flood control project at and surrounding the DAPL crossing were acquired by the United States pursuant to the Flood Control Act of 1944 and Public Law 85-915, are controlled by the United States and administered by the Corps, and fall within the scope of NAGPRA.

50. NAGPRA vests ownership and control of Native American human remains and cultural items excavated or discovered on Federal lands, and imposes mandatory duties that attach when such remains or items are discovered or excavated. 25 U.S.C. § 3002. A person who discovers Native American human remains or cultural items on Federal lands in connection with an activity must notify the responsible federal agency, cease activity in the area of the discovery, and make a reasonable effort to protect the remains or items; activity in the area may resume only after the statutory period and required certifications. 25 U.S.C. § 3002(d). The intentional excavation or removal of Native American human remains or cultural items from Federal lands

is prohibited except pursuant to a permit issued under the Archaeological Resources Protection Act and after consultation with the appropriate Tribe. *Id.* § 3002(c).

51. The Department of the Interior comprehensively revised NAGPRA's implementing regulations effective January 12, 2024. 43 C.F.R. § 10; 88 Fed. Reg. 86452 (Dec. 13, 2023). Under the revised regulations, a "discovery" means "exposing, finding, or removing human remains or cultural items whether intentionally or inadvertently on Federal or Tribal lands without a written authorization for an excavation under § 10.6." 43 C.F.R. § 10.2.

52. "Before a planned activity or after a discovery, the Federal agency . . . must identify consulting parties and invite the parties to consult." *Id.* § 10.4(b)(1). The agency must prepare and approve a plan of action, developed through that consultation, *id*. § 10.4(b)(2), addressing the treatment of human remains and cultural items that may be encountered before any planned adverse activity. *Id.* § 10.4(c); 88 Fed. Reg. at 86490. The plan must be signed and provided to consulting parties. § 10.4(b)(3). Finally, the plan must address, among other things, the consulting parties' preferences for protecting and treating human remains and cultural items, the applicable duty of care, procedures for informing consulting parties of a discovery, procedures for evaluation the need for excavation, and disposition. *Id.*

53. The likelihood of discovery or excavation must be determined based upon previous studies, discoveries, or excavations in the general proximity of the planned activity and in consultation with potentially affiliated Tribes and lineal descendants. *Id.* at 10.4(b).

54. Upon a discovery, the agency must secure and protect the remains or items, including, where necessary, by stabilization and covering. 43 C.F.R. § 10.5; *see Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 83 F. Supp. 2d 1047, 1057 (D.S.D. 2000) (Corps, as

discoverer and land-managing agency at a Missouri River reservoir, had statutory duties to make reasonable efforts to protect and to secure inadvertently discovered remains).

55. NAGPRA separately governs actual discoveries. Any person who knows or has reason to know of a discovery on Federal lands must report it and make reasonable efforts to secure and protect the remains or cultural items. 43 C.F.R. § 10.5. Where discovery is related to an activity, any adverse activity that could threaten the discovery must cease and may resume only in accordance with the procedures prescribed by 43 C.F.R. § 10.5(b)-(e).

56. NAGPRA's duties of protection, notification, certification, and consultation extend to each discovery of Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony. *Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008, 1025–26 (D.S.D. 2002). These duties are mandatory, run to the federal agency whose ownership or control of the land and authorization of the activity trigger them, and are broader in scope than the NHPA's. *See* 88 Fed. Reg. 86487.

57. NAGPRA duties are distinct from the Corps' obligations under the NHPA. Federal agencies may coordinate NAGPRA compliance with their responsibilities under other federal laws, but compliance with NAGPRA does not relieve an agency of its independent obligations under NHPA § 106. 43 C.F.R. § 10.4(d).

**G. The Clean Water Act — Oil Spill Prevention and Response Planning**

58. Congress enacted the Clean Water Act ("CWA") to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 311 of the Act declares the policy of the United States that "there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States" and establishes a

comprehensive scheme of oil spill prevention, preparedness, and response. 33 U.S.C. § 1321(b)(1).

59. The Oil Pollution Act of 1990 incorporated section 311(j) into the Clean Water Act. Subsection 5 requires the owner or operator of an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters, to prepare and submit "a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A)(i). A "worst case discharge" for an onshore facility is "the largest foreseeable discharge in adverse weather conditions." *Id.* at § 1321(a)(24).

60. Section 311(j)(5) requires certain facilities that pose a risk of substantial harm to prepare and maintain a facility response plan ("FRP") governing the facility's preparedness for and response to an oil discharge. For an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging oil into waters or adjoining shorelines, the FRP must provide for responding, to the maximum extent practicable, to a worst case discharge and to a substantial threat of such a discharge. 33 U.S.C. § 1321(j)(5)(A), (C).

61. A facility response plan must, among other requirements, be consistent with the National Contingency Plan and applicable Area Contingency Plans; identify the qualified individual having full authority to implement removal actions; identify and ensure by contract or other approved means the availability of private personnel and equipment necessary to remove, to the maximum extent practicable, a worst case discharge; describe training, equipment testing,

periodic unannounced drills, and response actions; and be updated periodically and resubmitted for approval of each significant change. 33 U.S.C. § 1321(j)(5)(D).

62. For a facility that could, by discharging, be reasonably expected to cause "significant and substantial harm" to the environment, the reviewing agency must promptly review the response plan, require amendments to any plan that does not satisfy the statutory requirements, approve a plan only if it meets the statutory requirements, and periodically review the plan thereafter. *Id.* at § 1321(j)(5)(E). A facility required to prepare a response plan "may not handle, store, or transport oil" unless its plan has been approved and the facility is operating in compliance with the plan. *Id.* § 1321(j)(5)(F).

**H. PHMSA — Delegated Response-Plan Authority and Pipeline Safety Regulation**

63. Responsibility for implementing section 311(j)(5) with respect to transportation-related onshore facilities, including hazardous liquid pipelines such as DAPL, has been delegated by the President to the Secretary of Transportation, and by the Secretary to defendant PHMSA. Exec. Order No. 12,777, 56 Fed. Reg. 54757 (Oct. 22, 1991); 49 C.F.R. § 1.97. PHMSA accordingly reviews and approves facility response plans for onshore oil pipelines under 49 C.F.R. § 194.119.

64. Part 194 requires each pipeline operator to determine the worst case discharge for each response zone and to provide the methodology, including its calculations, used to determine that discharge. 49 C.F.R. § 194.105(a). For pipelines, the calculations prescribed by 49 C.F.R. § 194.105(b)(1) include the sum of, among other components, the pipeline's maximum release time in hours, plus the maximum shutdown response time in hours "(based on historic discharge data or in the absence of such historic data, the operator's best estimate)," multiplied by the

maximum flow rate expressed in barrels per hour, plus the largest line drainage volume after shutdown of the line section(s) in the response zone. *Id*.

65. Part 194 requires response planning to account for the conditions under which response equipment will actually be required to function. "Adverse weather" expressly includes ice conditions, temperature ranges, weather-related visibility, significant wave height, and currents within the area in which response systems and equipment are intended to function. 49 C.F.R. § 194.5.

66. Each plan must be consistent with the National Contingency Plan and each applicable Area Contingency Plan. 49 C.F.R. § 194.107. In addition, a plan must identify response resources sufficient to respond to a worst case discharge. *Id.* § 194.115. Operators whose pipelines could reasonably be expected to cause significant and substantial harm must obtain PHMSA approval of their response plans. This category includes pipelines such as DAPL, where the pipeline is of sufficient diameter and length with the potential to impact environmentally sensitive areas. *Id.* §§ 194.103, 194.119. PHMSA may approve such a plan only upon determining that it meets the requirements of Part 194. *Id.*

67. Operators must review and update plans to reflect new or material changes, including changes in the pipeline's operating conditions. Where a new or different operating condition or information would substantially affect implementation of the plan, the operator must modify the plan and resubmit the change to PHMSA. *Id.* § 194.121.

68. PHMSA separately administers the federal Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, and its hazardous liquid pipeline safety regulations at 49 C.F.R. pt. 195. A pipeline segment that could affect a "high consequence area" — including commercially navigable waterways, high-population areas, and areas unusually sensitive to environmental damage such

as drinking water resources — is subject to enhanced integrity management plan requirements, including leak detection means and consideration of emergency flow restricting devices. 49 C.F.R. §§ 195.450, 195.452.

## FACTUAL ALLEGATIONS

### I. THE STANDING ROCK SIOUX TRIBE

69. Plaintiff Standing Rock Sioux Tribe resides on its 2.3 million acre Reservation, beginning on the Missouri River in the central Dakotas and spreading westward for over 100 miles across the northern Great Plains. Some of the most prominent events in American history took place at Standing Rock, whose great leader, Sitting Bull, made his home near the Rock Creek community along the Grand River.

70. Standing Rock is part of a larger Native Nation, the *Oceti Sakowin Oyate* (Lakota for "Seven Council Fires"), commonly referred to as the Great Sioux Nation. The seven bands of Sioux share a common geography, language, and culture, with three distinct language dialects — Lakota, Dakota, and Nakota.

71. The Tribe's ancestors entered into two major Treaties with the United States. In the 1851 Fort Laramie Treaty, the United States recognized a wide swath of the northern plains as Sioux Country, beginning on the Missouri River to the Platte River, west to the Big Horn Mountains, and north to the Heart River in present-day North Dakota. 11 Stat. 749. The Sioux granted the United States permission for western emigrants to traverse Sioux Country on the Oregon Trail. Beginning in approximately 1864, trespassers began traveling northward through the Powder River basin to explore for gold in the northern Rocky Mountains, impacting important buffalo hunting grounds of the Lakota. Sioux forces under Sitting Bull defended the

northern hunting grounds, including at Killdeer Mountain in 1864, and warriors led by Red Cloud shut down the Bozeman Trail in the war of 1866–1868.

72. Sioux victories in that war prompted the United States to sue for peace, resulting in the Fort Laramie Treaty of 1868. The 1868 Treaty established the Great Sioux Reservation, beginning on the east bank of the Missouri River and comprising all land within the boundaries of present-day South Dakota west of the Missouri. 15 Stat. 635. The Sioux agreed to establish permanent settlements at the Reservation, but the lands identified as Sioux territory in the 1851 Treaty that lie outside the Great Sioux Reservation remained in Sioux ownership, designated as "unceded territory" with hunting, fishing, and gathering rights preserved. *Id.* at 639. Article 1 of the 1868 Treaty contains the "bad man clause," which codifies the commitment of the United States to punish those who commit any wrong upon the person or property of the Indians and to keep such wrongdoers out of the Tribe's Treaty lands, including the unceded land over which DAPL crosses. Additionally, military posts within the boundaries of unceded Treaty territory were to be abandoned and vacated, with the roads to Montana permanently closed. 15 Stat. 635.

73. A military incursion into the Great Sioux Reservation in 1874 discovered gold, leading to the Black Hills gold rush. After the historic victory at the Battle of the Little Bighorn in 1876, in which Sitting Bull played a leading role, Sioux military resistance began to subside. Congressional acts in 1877 and 1889 forcibly acquired Sioux Reservation lands, removing the Black Hills from the Reservation and then establishing new boundaries for seven smaller Sioux Reservations, including Standing Rock. Act of Feb. 28, 1877 (1877 Act), 19 Stat. 254; Act of Mar. 2, 1889, 25 Stat 888. The Supreme Court ruled that the taking of Sioux Nation treaty lands under the Act of 1877 violated the Fifth Amendment, observing that "[a] more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history." *United States v.*

*Sioux Nation of Indians*, 448 U.S. 371, 388 (1980). The Tribe continues to work toward a just and comprehensive resolution involving land restoration in the Black Hills.

74. Congress enacted the Flood Control Act of 1944, 58 Stat. 887, authorizing the Corps of Engineers to develop five massive earthen dams on the upper Missouri River. The Corps sited the dams to maximize the impacts on the Sioux Reservations and minimize adverse impacts to non-Tribal communities in the Dakotas. One of the largest of the projects, Oahe, resulted in the taking of 56,000 acres of wooded, fertile riparian lands at Standing Rock and caused the forced relocation by the Corps of four Standing Rock Tribal communities — Cannon Ball, Fort Yates, Kenel, and Wakpala — as the braided Missouri River was impounded in 1960 to create Lake Oahe. The Cannon Ball community, the closest town to DAPL along its 1,174-mile route, was established at its current townsite after being physically relocated by the Corps from its longtime homeland along the river.

75. The Standing Rock Reservation lands taken by the Corps for Lake Oahe were lush, wooded Missouri River bottomlands, teeming with waterfowl and wildlife. They provided rich, fertile soils for community gardens and Tribal livestock, plentiful water supplies, a wealth of natural foods and medicinal plants, and timber for heating and the construction of homes.

76. On September 2, 1958, Congress enacted Public Law 85-915, 72 Stat. 1762, providing for *de minimis* payment for Standing Rock Reservation lands taken by the Corps for the site of Lake Oahe. The Act required the Corps to perform certain mitigation, including the relocation of cemeteries and infrastructure, but the Corps failed to carry out its duties under the statute. Consequently, thousands of cultural resources and human remains remain deposited in the banks of Lake Oahe, including at and around the site where DAPL crosses the Missouri

River. *See* U.S. Army Corps of Engineers, *Final Environmental Impact Statement, Missouri River Master Water Control Manual Review and Update* 3-167 to 3-168 (2004).

77. The waters of the Missouri River, and all waters flowing freely in nature, hold spiritual and religious significance for the Tribe. The Lakota and Dakota refer to water as the "first medicine," reflecting that we are nurtured in the womb in water. The Lakota phrase associated with Indigenous opposition to DAPL, *mní wičóni*, means "water of life" or "water is life," depending on the context of usage. Water plays a central role in the Lakota and Dakota creation story and cosmology, and in the most significant religious ceremonies of the Lakota and Dakota — the *inipi*, or sweat lodge ceremony, in which water is poured on heated rocks for purification, and the Sun Dance, in which prayer and self-sacrifice for the greater good involve fasting from both food and water for four days.

78. The Lakota and Dakota call the Missouri River *Mni Sose*, meaning murky or dark waters — a reference to the turbidity that deposits fertile soils along the water's edge and is considered life-giving.

79. Today, the Missouri River at Lake Oahe is the Tribe's drinking water source, as well as essential aquatic and riverine habitat for the subsistence hunting and fishing way of life on the Reservation. Any release of oil into the Missouri River would directly and adversely affect public health and welfare on the Standing Rock Reservation and the culture and way of life of the Standing Rock Sioux Tribe.

## II. DAPL AUTHORIZATION AND THE 2016 LITIGATION

80. On or about October 21, 2014, Energy Transfer LP filed an application for an easement and permit for the Dakota Access Pipeline to cross the federally administered flood control project at Lake Oahe. Dakota Access LLC, Request for Pipeline Easement and

Temporary Construction License for the Proposed Dakota Access Pipeline Project at Lake Oahe (October 21, 2014), https://usace.contentdm.oclc.org/digital/collection/p16021coll5/id/1735.

81. Dakota Access is the owner of the Dakota Access Pipeline and a non-wholly owned subsidiary of Energy Transfer L.P., which holds a controlling interest in DAPL. Dakota Access has contracted with DAPL-ETCO Operations Management, LLC for the operation of DAPL. Sunoco Pipeline L.P. has been delegated the operational functions of DAPL by DAPL-ETCO Operations Management, LLC, and is a wholly owned Energy Transfer subsidiary. *See* Energy Transfer LP, SEC Form 10-Q at 3 (2025), available at: https://ir.energytransfer.com/static-files/16152c72-872c-462b-b6c7-1d1ff04335c6. *See* FEIS App. F, Facility Response Plan at 1: usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/28532

82. DAPL is a 30-inch diameter, high-capacity hazardous liquid pipeline designed to transport Bakken crude oil from the western North Dakota oil fields to Midwest and Gulf Coast refineries; much of the refined crude is then exported overseas. The rate of flow initially contemplated was 570,000 barrels per day.

83. The pipeline crosses the Missouri River at the mouth of the Cannonball River on Lake Oahe, one-half mile upstream from the Standing Rock Indian Reservation and its Cannon Ball community. The crossing was effectuated by a horizontal directional drill stated by the ROD to be approximately 95 to 126 feet beneath the bed of Lake Oahe.

84. The mouth of the Cannonball River is an important ecological area to the Tribe, teeming with phytoplankton and biodiversity, and providing habitat for aquatic life, amphibians and migratory waterfowl.

85. The land area surrounding the mouth of the Cannonball River is replete with Tribal cultural objects, human remains and historical sites, and has been the site of sacred ceremonies, including areas that have been included in the National Register of Historic Places.

86. On July 25, 2016, the Corps issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the DAPL crossing at Lake Oahe.

87. On July 28, 2016, the Tribe filed an action in this Court for injunctive relief to enjoin construction of the pipeline segment at the Lake Oahe crossing. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-01534 (JEB) (D.D.C.).

88. On September 9, 2016, this Court denied the Tribe's motion for a preliminary injunction. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 7 (D.D.C. 2016). Thereafter, horizontal directional drilling operations commenced beneath the riverbed.

89. Also on September 9, 2016, the Corps, in conjunction with the Departments of the Interior and Justice, pledged to develop a report on improving Tribal consultation for infrastructure projects, effectively conceding the inadequacy of the consultation process utilized for the DAPL application.

90. The 2018 *Independent Assessment* ordered by this Court identified other potential violations and unauthorized releases at the HDD drilling site. Process Performance Improvement Consultants, LLC, *Independent Assessment of the Dakota Access Pipeline, U.S. Army Corps of Engineers, Easement Special Conditions,* (March 29, 2018) https://www.psc.nd.gov/webdocs/case/19-0204/081-010.pdf; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-01534 (JEB), ECF 347-2.

91. Recent publicly-available evidence indicates that during the horizontal directional drilling process, there were 774 incidents of "inadvertent returns" "involving the release of 1.4 million gallons of HDD drilling fluid over just one seven day period of drilling and installation operations beneath Lake Oahe." This information indicates that Energy Transfer LP and its contractors did not, as mandated by their HDD Contingency Plan, "dispatch experienced observers as required to monitor the area in the vicinity of the crossing, for inadvertent returns of drilling fluid at the surface or in the river," for these incidents. *See* Exponent Inc. Report (2024) available at: https://northdakotamonitor.com/wp-content/uploads/2024/10/dapl-exponent-report.pdf.

92. The available records likewise do not establish that Energy Transfer or its contractors effectively determined that the lost drilling fluid did not reach Lake Oahe: Exponent found that the field reports did not document how the absence of inadvertent returns to the surface was verified, that it was unknown where the lost drilling mud migrated, and that the materials reviewed contained no documentation showing that Lake Oahe was sampled to determine whether drilling mud had escaped to the lake bed. *Id.* at 14, 25, 29.

## III. DESTRUCTION OF BURIAL AND CULTURAL SITES

93. From approximately August 30 through September 2, 2016, Tim Mentz, Sr., an internationally recognized expert from the Standing Rock Sioux Tribe in the identification of burials and traditional cultural properties, conducted a reconnaissance-level survey near the pipeline route on private property adjacent to Corps-managed land, upon which he had been invited. Mentz found "one of the most significant archaeological finds in North Dakota in many years," including a burial ground associated with an elite warrior society, and predicted that these sites "would be destroyed by pipeline construction." *See* Declaration of Tim Mentz, Sr., *Standing*

*Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 1:16cv-01534-JEB, ECF 29-1. Mentz documented and mapped previously unidentified burial and cultural sites, including 27 graves or cairns, 16 stone rings, and 19 effigies. Among the stone features documented were the *Iyokaptan Tanka* (Big Dipper), *Chante Tinza Wapaha* (Strong Heart Society Staff), *Mato Wapiya* (Bear Medicine Healer), and *Itancha* (Chiefs Dreaming Pair with Staffs), which reflected ceremonial traditions associated with processes selecting and honoring great Chiefs, warriors, and healers. *Id.*

94. On September 2, 2016, the Tribe submitted Mr. Mentz's declaration in support of its pending request for emergency relief, identifying newly documented burial and cultural sites along the pipeline route and providing maps of their locations. The motion and declaration were served on the Corps and Energy Transfer LP that day.

95. On September 3, 2016, Energy Transfer LP's contractors relocated their heavy equipment approximately 20 miles, ahead of the construction sequence the company had previously disclosed to public officials, directly to the property surveyed by Mr. Mentz, and graded and dug eight to ten feet into the soil along the pipeline route - far deeper than other pipeline segments - destroying the burials and stone features associated with the graves identified in the declaration served the previous day. *See* Water Protector Legal Collective, *For the Love of Water: 10 Year Retrospective Report,* April 2026, https://www.waterprotectorlegal.org/legal/for-the-love-of-water-report.

96. Upon information and belief, based on law enforcement records obtained by public records request, days before the destruction the operator's representatives had provided public officials a construction schedule identifying a later date for work in the area Mr. Mentz surveyed; on the night the Mentz declaration was filed, a private security firm working for

Energy Transfer contacted a security-dog company to arrange for dogs at the pipeline route the following morning; and the following morning, the bulldozers arrived at the surveyed area more than five days ahead of the disclosed schedule.

97. Mr. Mentz stated in his August 11, 2016 declaration: “Destruction of these sites will eventually destroy generations of family connections to these areas of spiritual power. . . . These sites still retain the ability to mend our people.” Declaration of Tim Mentz, Sr., *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 1:16-cv-01534-JEB, ECF 16. After the destruction, surveying the damage from the roadside, Mr. Mentz observed that a significant portion of the surveyed site had been cleared, and stated: “I do not believe that the timing of this construction was an accident or coincidence.” Declaration of Tim Mentz, Sr., *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 1:16-cv-01534-JEB, ECF 30-1.

98. On September 4, 2016, the Tribe filed an emergency motion for a temporary restraining order to prevent further destruction of sacred and cultural sites along the pipeline route. The Tribe reported that most of the stone features documented in Mr. Mentz’s September 2 declaration, “which had stood undisturbed for centuries, had been destroyed,” and that construction crews had graded the entirety of the approximately two-mile stretch surveyed by Mr. Mentz:

> The dramatic destruction of important and unique sites, less than 24 hours after the Tribe described them, calls [DAPL’s] representations to the Court into question. The Tribe never received notification of imminent construction. It never had an opportunity to monitor that site “during and after” construction activity. Prior to the survey this past week at the landowner’s invitation, it never had an opportunity to survey the site. The picture of care for tribal cultural sites that DAPL has presented to this Court simply doesn’t accord with the facts on the ground… it appears that the Tribe’s efforts to pursue its rights through this lawsuit were used against it. Within hours of being provided with detailed evidence of major archaeological discoveries directly in and adjacent the pipeline’s route, DAPL brazenly bulldozed those sites, on the Saturday of a holiday weekend.

*See* Standing Rock Sioux Tribe's Emergency Motion for a Temporary Restraining Order, *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 1:16-cv-01534-JEB, ECF No. 30 (D.D.C. Sept. 4, 2016).

99. The Corps has been on notice of these facts since September 2, 2016, when the Mentz Declaration was served. The Corps received further contemporaneous notice through the Tribe's September 4, 2016 emergency filing documenting the destruction of the identified sites, as well as repeated formal notice in the years since, including through the October 14, 2016 letter of Paul W. Edmondson, General Counsel of the National Trust for Historic Preservation, to then-Assistant Secretary Jo-Ellen Darcy, administrative comments, correspondence, and the Tribe's 2024 complaint in No. 24-cv-2905.

100. Notwithstanding its non-discretionary duties under NHPA section 110(k), the Corps authorized the second easement without investigating whether the destruction was undertaken with intent to avoid section 106 review, without making a section 110(k) determination, and without consulting the Advisory Council on Historic Preservation, as the Act requires.

101. In the FEIS and ROD, the Corps nevertheless concluded that DAPL construction did not result in the destruction of sacred sites or burial grounds identified by the Tribe. FEIS at pg. 3-199-200, paragraph 236; ROD at pg. 32-33 ("Consultation completed; No Historic Properties Affected; ND SHPO concurrence from 2016 remains valid."; *see also* ROD at pg. 32-33 "The project will comply with NAGPRA."). That conclusion is inconsistent with the historical record, sworn declarations from Tribal cultural experts, contemporaneous evidence submitted to the Corps and federal courts, and other evidence available to the Corps concerning the September 3, 2016, destruction.

102. In reaching that conclusion and addressing the Tribe's identification of the affected places as burial, cultural, and sacred sites, the Corps relied upon assertions by Dakota Access that no sites were impacted. Energy Transfer and Dakota Access' assertions were based on assessments by non-Tribal archaeologists, including then-North Dakota State Historic Preservation Office archaeologist Paul Picha and Dakota Access-contracted archaeologist Jason Kovacs, to discount the Tribe's identification of the affected places as burial, cultural, and sacred sites.

103. In publicly available sworn deposition testimony, both archaeologists subsequently confirmed material limitations in those assessments. Energy Transfer's own contracted archaeologist, Kovacs, acknowledged that he was "not qualified to assess what is a tribal cultural property or not," and testified that even when Tribal representatives provided information concerning the significance of particular places, that information did not affect his archaeological assessment. He further explained that his assessment was confined to archaeology and that, in most circumstances, archaeologists lacked access to the Tribal perspective concerning a site's cultural significance. *See* Deposition of Jason Kovacs at 7-8, 9-12 available at SLAPP'd Document Cloud, Ep. 5, https://www.documentcloud.org/documents/26040642-ep5kovacsdeposition/.

104. Paul Picha from the State Historic Preservation Office similarly acknowledged that the Standing Rock Sioux Tribe could define a cultural site differently from the North Dakota State Historic Preservation Office and a SHPO determination that a place was not a cultural site did not in fact establish that it was not a cultural or sacred site to the Tribe:

> "Q: But it would be fair to say that the Dakota people – or specifically the Standing Rock Sioux Tribe – could have a different definition of what a cultural site is than that of the

> North Dakota State Historic Preservation Office? A: Yes. Q: Okay. And so when we – when the North Dakota State Historical Preservation Office puts in a proclamation, or, you know, concurs or doesn't concur with a – whether something is a cultural site, they're just applying their own definition, correct? A: Yes. Q: And so if North Dakota State Historic Preservation Office says something isn't a cultural site, that doesn't mean it's not a cultural site to the Standing Rock Sioux Tribe, correct? A: Yes. … Q: Okay. In your work as an archaeologist, did you have a definition of the term "sacred site"? A: No, I did not. Q: Okay. And do you believe that within archaeology people could have different definitions of sacred site? A: Yes."

*See* Deposition of Paul Picha at 7-8, available at SLAPP'd Document Cloud, Ep. 5, https://www.documentcloud.org/documents/26040645-ep5pichadeposition/.

105. Despite the Tribe's repeated presentation of evidence concerning the September 3, 2016 destruction, the Corps did not reconcile its conclusion in the Final EIS and ROD with the Tribe's evidence or investigate the circumstances of the destruction before issuing the May 21, 2026 Record of Decision and authorizing a new twenty-five-year easement.

## IV. VACATUR OF THE 2017 EASEMENT AND THE COURT-ORDERED EIS

106. On December 4, 2016, then-Assistant Secretary of the Army for Civil Works Jo-Ellen Darcy announced that consideration of an easement for DAPL would be undertaken through preparation of an environmental impact statement.

107. On January 24, 2017, the President issued a Presidential Memorandum directing the Corps to expedite the review and approval of the pipeline. 82 Fed. Reg. 8661 (Jan. 30, 2017).

108. On February 8, 2017, the Corps issued an easement authorizing the pipeline crossing under Section 28 of the Mineral Leasing Act, 30 U.S.C. § 185, at a capacity of 570,000 barrels per day.

109. On March 25, 2020, this Court granted partial summary judgment to the Tribe, holding that the Corps violated NEPA because serious and unresolved expert criticisms remained regarding DAPL's leak-detection capabilities, the operator's safety record, oil remediation during winter ice cover, and the calculation of the worst case discharge, and directing the Corps to prepare an environmental impact statement. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 17–21 (D.D.C. 2020).

110. On July 6, 2020, this Court vacated the 2017 easement pending completion of the EIS. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 471 F. Supp. 3d 71, 77–78 (D.D.C. 2020).

111. On January 26, 2021, the D.C. Circuit affirmed the vacatur of the easement and the directive to prepare an EIS, noting that the Corps was expected to vindicate its property rights, while reversing the district court's order that the pipeline cease operations. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1054 (D.C. Cir. 2021).

## V. OPERATION WITHOUT AN EASEMENT (2020–2026)

112. From the vacatur of the 2017 easement until issuance of the ROD challenged herein authorizing the easement, DAPL operated across the federally managed flood control project at Lake Oahe without the easement required by the Mineral Leasing Act, 30 U.S.C. § 185(a), without an environmental review compliant with NEPA, 42 U.S.C. § 4332, and contrary

to the Corps' regulations governing realty outgrants and unauthorized structures on project lands. 32 C.F.R. § 651.10(i); 36 C.F.R. § 327; 36 C.F.R. § 327.20.

113. The Corps declined to exercise its authority to halt the pipeline's operation during that period, and instead permitted a private company to occupy and use federal flood control project lands for nearly six years without any valid outgrant — effectively allowing the operator to bypass the environmental analysis whose absence had invalidated its authorization.

114. During this time, none of the deficiencies identified in the 2018 *Independent Assessment* were addressed by Energy Transfer. On July 22, 2021, defendant PHMSA served on Energy Transfer LP a Notice of Probable Violation (NOPV), Proposed Civil Penalty, and Proposed Compliance Order, alleging probable violations of the Pipeline Safety Regulations at DAPL. Energy Transfer continued to ignore and disrespect the Tribe and the need for coordination with emergency planning.

## VI. LAKE OAHE CONDITIONS: LOW WATER AND ICE

115. The Corps' operation of Oahe Dam has a significant effect on the Reservation's water supply and on the aquatic and riverine habitat of Lake Oahe. The Corps' pattern of water releases causes reservoir levels to fluctuate dramatically, by design, in order to provide reliable flows downstream. *See* U.S. Army Corps of Engineers, *Missouri River Mainstem Reservoirs Master Water Control Manual*, VII-6 - VII-7 (2018), https://usace.contentdm.oclc.org/utils/getfile/collection/p266001coll1/id/8200.

116. When Lake Oahe is at normal or flood level, it is a cold-water reservoir with a large surface area, accessible from boat docks managed by the Tribe on the Reservation and by the States of North and South Dakota elsewhere.

117. During periods of drought and low water, including as a result of the Corps' releases of water downstream from Oahe Dam, the reservoir recedes into a braided river resembling the historic pre-dam Missouri. The de-watered lake bed transforms into mud flats surrounding the relocated Tribal communities, such as Cannon Ball. Invasive plants and insects proliferate. Erosion caused by fluctuating water levels extends to Tribal lands and exposes and destroys cultural sites on the bed and banks of the reservoir.

118. Low water conditions impair access to the reservoir. During periods of low water, boat ramps and docks become unusable or access to the reservoir by boat becomes limited or non-existent, while soft ground on the mud flats prevents vehicle access on undeveloped roads, and even persons on foot hiking to the water's edge. Livestock become mired in the mud and must be euthanized.

119. Low-water conditions have also affected the Reservation's drinking water infrastructure and the operation of the Tribal Farm enterprise. On November 23, 2003, the deposit of silt at the Standing Rock drinking water intake at Fort Yates during a period of low water caused the intake to malfunction, leaving three Tribal communities without potable drinking water for ten days and requiring repairs costing approximately $14 million. *See Water Problems on the Standing Rock Indian Reservation*: *Hearing Before the S. Comm. on Indian Affairs*, 108th Cong. 1–4 (2004) (statement of Chairman Charles W. Murphy).

120. Periods of flooding or persistent drought, such as has been experienced for the past 5 years, intensify the water fluctuations and their impact on adjoining land. The impacts to land from water level fluctuations at the upper Lake Oahe are dramatic. Because of the relatively gentle slope at the water's edge, the decline of a single foot of water creates a large ring of mud

flat. When water elevations drop several feet, thousands of acres of exposed lake bed impede access to the water.

121. The "normal" level of Lake Oahe is identified by the Corps as the top of the "multi-purpose pool," elevation 1607.5 feet above mean sea level ("msl"). Missouri River Mainstem System Final Annual Operating Manual (2023-2024) https://www.nwd-mr.usace.army.mil/rcc/reports/pdfs/finalAOP2023-2024.pdf; Missouri River Mainstem Reservoirs Master Water control Manual (2018), https://www.nwd-mr.usace.army.mil/rcc/reports/mmanual/MissouriMainstemMasterManual2018.pdf.

122. Beginning in 2021, spring inflows into the Missouri River reservoir system declined due to persistent drought. By December 1, 2022, the elevation of Lake Oahe had declined to 1589.11 msl. Missouri River Basin Water Management Mainstem and Tributary Reservoir Bulletin, 12-01-2022: https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_01122022.pdf. At that elevation, the boat docks on upper Lake Oahe — the oil spill response zone — are generally unusable for access to the reservoir.

123. Through 2022 and 2023, reservoir levels remained as much as 10-15 feet below normal, severely limiting access to the water. On December 1, 2023, the Corps reported Lake Oahe at 1598.2 msl. Missouri River Basin Water Management Mainstem and Tributary Reservoir Bulletin, 12-01-2023: https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_01122023.pdf. It rose to 1603.5 msl on April 1, 2024, but dropped to 1596.2 msl by December 1, 2024. Missouri River Basin Water Management Mainstem and Tributary Reservoir Bulletin, 04-01-2024: https://www.nwd-

mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_01042024.pdf ; Missouri River Basin Water Management Mainstem and Tributary Reservoir Bulletin, 12-01-2024: https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_01122024.pdf. Under these recurring conditions, the reservoir at the DAPL crossing is a shallow, braided river diffused with sandbars and side channels, and very low depths, in which navigating watercraft is extremely difficult.

124. As of August 2026, the elevation of Lake Oahe was 1594.7 msl, about 13 feet below normal. Missouri River Basin Water Management Mainstem and Tributary Reservoir Bulletin, 08-23-2026: https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_23082026.pdf. Access to the reservoir by boat remains severely limited.

125. Lake Oahe is also covered by ice for approximately four months of each year. Oil released beneath or into ice-covered water cannot be located, contained, or recovered by conventional surface-collection methods, and response work under ice conditions presents severe practical and worker-safety obstacles. *See* State and Federal Trustees, State of Montana, U.S. Department of Interior, *Final Programmatic Damage Assessment and Restoration Plan and Environmental Assessment for the Bridger Pipeline 2015 Yellowstone River Oil Spill* (July 2023) https://www.dojmt.gov/wp-content/uploads/2023_09_13-Final-Bridger-Restoration-Plan-reduced.pdf.

126. The 2023 Facility Response Plan and Geographic Response Plan both identify ice slotting as a response technique. Experience during the 2015 Bridger Pipeline spill, however, demonstrated significant limitations associated with response under winter and ice conditions,

including variable ice thickness and the migration and trapping of oil beneath cracks in the ice. *See* FEIS, Appendix F: https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/28532

127. These low water and winter conditions bear directly on whether the response resources and techniques identified for DAPL can be deployed effectively under the environmental conditions prevailing at Lake Oahe.

## VII. THE FACILITY RESPONSE PLANS (2017 AND 2023)

128. Under section 311(j)(5) of the Clean Water Act, DAPL may lawfully operate only under a facility response plan ("FRP") that provides for response to a worst case discharge to the maximum extent practicable. 33 U.S.C. § 1321(j)(5). Under PHMSA's regulation governing calculation of the worst case discharge, the operator must calculate, by largest volume for each variable, the pipeline's maximum release time plus maximum shutdown response time (based on historic discharge data or, in its absence, the operator's best estimate), multiplied by maximum flow rate, plus the largest line drainage volume after shutdown in the response zone. 49 C.F.R. § 194.105(b)(1).

129. On February 23, 2017, defendant PHMSA approved Energy Transfer LP's *Facility Response Plan Dakota Access Pipeline North Response Zone, Sequence No. 3056* (2017) (the "2017 FRP").

130. The operator also prepared the *Dakota Access Pipeline Geographic Response Plan, Missouri River/Lake Oahe, Emmons County, North Dakota* (March 2018) (the "2018 GRP"). Both the 2017 FRP and GRP were provided to the Tribe only in redacted form.

131. PHMSA never consulted the Tribe on approval of the FRP, even though the response zone is largely within the Standing Rock Indian Reservation.

132. The 2017 FRP identified the worst case discharge from DAPL as 12,501 barrels. That is not a realistic calculation; it is a small fraction of the actual worst case discharge that could result from a release into the Missouri River at the original 570,000 barrel per day capacity.

133. Strict compliance with the facility response planning requirements is especially important for an operator such as Energy Transfer, with a long record of oil spills and prior pipeline safety violations.

134. The 2017 FRP relied on an Energy Transfer contractor's calculation of worst case discharge based upon the formulation: "The Total Volume of Oil Released = The volume of oil that leaves the pipeline under pressure before the pumps are shut down + the volume of oil remaining in the pipeline between the next nearest valves." That calculation used only the 9 minutes to shutdown the pumps then added the drain-down volume to arrive at the worst case discharge. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d at 29; *see* RAR 14959–87.

135. The calculation that was used for the 2017 FRP worst case discharge did not adequately account for the time required to detect the spill, human decision-making before shutdown, the time to shut the emergency shutoff valves referred to by PHMSA as Emergency Flow Restriction Devices ("EFRDs") that isolate a pipeline spill, nor the impact of winter conditions.

136. The 2017 calculation claimed to use 12.9 minutes for shutdown: 9 minutes for the pump shutdown and 3.9 minutes for the closure of the EFRD - not the 9-minutes actually used. It was a "best case" approach based upon touted equipment functioning. *Standing Rock Sioux Tribe*

*v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-01534 (JEB), RAR-254. The Corps' contrary arguments were found "unsupported." *Standing Rock Sioux Tribe*, 440 F. Supp. 3d at 23.

137. PHMSA approved a 2023 version of the FRP and GRP, included in Appendix F of the FEIS. https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/28532.

138. The 2023 plans are redacted to a much greater degree than the earlier versions, despite the fact that they were found to be an unresolved controversy amongst experts. *Standing Rock*, 440 F.Supp.3d at 23. The most important information for local responders — including spill detection, response zone maps, the method of calculating the worst case discharge, *FRP* at 23, 56-57, 118-137, and the locations of and information about access and control points, *GRP* at 190-321 — is redacted or otherwise not provided.

139. The extensive redactions undermine the ability of the Tribe and the public to evaluate the adequacy of the plans, and the ability of Tribal first responders to prepare for an oil spill, placing their health and safety at risk.

140. Although this Court determined that the applicable protective order did not apply to the 2017 GRP, the Corps and Energy Transfer have provided the 2023 GRP to the Tribe and the public in highly redacted format. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,* No. 1:16-cv-01534 (JEB), ECF No. 206 at 12*, Memorandum Opinion* (D.D.C. Apr. 7, 2017).

141. An understanding of the 2023 FRP worst case discharge volume, relied upon by the Corps in the ROD and FEIS, is hampered by the fact that no calculations or methodology were provided, even though required by the PHMSA Worst Case Discharge ("WCD") regulation. 49 C.F.R. § 194.105(a).

142. The 2023 FRP failed to remedy the flaws in the 2017 FRP, including the miscalculation of the worst case discharge, the overly optimistic estimates of leak detection and shutdown times, and the failure to plan for the low water and variable riverine and reservoir conditions in the spill response zone.

143. In the ROD and FEIS, the Corps adopted a different methodology to arrive at the same detection and shutdown time of 12.9 minutes, per the 2023 FRP.

144. This Court vacated the 2017 easement for DAPL, whose FRP provided 0-1 minutes for detection, 8-9 minutes to shut down the pumps and 3.9 minutes to close the emergency flow restriction devices. *Standing Rock*, 440 F.Supp.3d at 23. The record suggested that the Corps relied upon Energy Transfer's unsubstantiated assertion that the pump stations were "designed" to shut down in 9 minutes. DAPL Environmental Analysis Correspondence, in ProjNet, 2015-2016 at 93, USACE_DAPL0072253, *see* https://www.projnet.org/projnet/binKornHome/index.cfm.

145. In the FEIS, the Corps accepted a reduced pump shutdown time by three minutes (from 9 to 6) without explanation. FEIS at 3-38. The Corps then added the same three minutes to spill detection time (previously estimated to be 0-1 minute), without explanation, to coincidentally arrive at the same 12.9 minutes for pipeline shutdown time as the 2016 analysis. *Id*.

146. The ROD and FEIS rely on a "best case" scenario, not a worst case estimate as required in the regulations, because there is no time allotted for human decision-making.

147. The applicable regulations of defendant PHMSA require the worst case discharge calculation to be based on such historic discharge data. 49 C.F.R. § 194.105(b)(1).

148. Energy Transfer took 12 days to evaluate the "anomalies" in its 2016 Sunoco LP incident before the 8600 Bbl spill was detected, and 16 months in its Sunoco Twin Oaks spill. *PHMSA Accident Report – Hazardous Liquid and Carbon Dioxide Pipeline Systems," Sunoco Pipeline L.P, 8-29-2016, last revision date 7-24-2017, p.23; Notice of Proposed Safety Order, PHMSA, CPF No. 4-2025-054-NOPSO, 2-13-25, p.2.* Three minutes is not a reasonable maximum detection time for DAPL.

149. The 2017 FRP provided for surface collection of oil at four access, collection, and control points, many of which relied on existing boat docks along the banks of Lake Oahe. One identified access point was not a boat dock at all, but an irrigation intake pad — a point that provides no feasible access to the reservoir under any conditions.

150. Defendant PHMSA did not consult with the Tribe prior to approving the 2023 FRP, or at any time.

151. A release of oil from DAPL into or along the Missouri River would migrate to the Reservation. Oil spill cleanup and remediation would accordingly proceed under the authority of the Standing Rock Tribal government, supervised by the Tribal Emergency Response Commission. Yet neither the defendants nor the operator has contacted the Tribe's Department of Emergency Management, the Cannon Ball community, or the Cannon Ball–Solen School District regarding emergency planning or response, and the defendants have not required the operator to share unredacted emergency plans with the Tribe — which the operator has never done.

152. The Tribe enacted the *Standing Rock Sioux Tribe Pipeline Oil Spill Emergency Response Plan* (March 2020) to prepare for oil spill remediation at Lake Oahe. On July 9, 2021,

the Tribe provided a copy to the then Commander of the Omaha District and requested engagement on emergency planning. The defendants never responded.

153. Material conditions relevant to implementation of the response plan have changed since approval of the original FRP. DAPL's throughput has increased from approximately 570,000 bpd to approximately 1.1 million bpd; persistent low-water conditions have altered access to response locations at Lake Oahe; and Energy Transfer has announced plans involving transportation of substantial quantities of Canadian crude through DAPL. These changes affect the assumptions underlying worst case discharge and emergency response planning and render them unsupportable.

## VIII. OPERATOR RECORD AND PHMSA SAFETY VIOLATIONS

154. On April 2, 2018, Energy Transfer filed with this Court and served on the Corps an *Independent Assessment of Dakota Access Pipeline U.S. Army Corps of Engineers Special Easement Conditions*, prepared by an oil industry consulting firm retained and paid by Energy Transfer. The report detailed numerous violations of the conditions attached to the 2017 easement and of the regulations governing the operation of hazardous liquid pipelines. No. 1:16-cv-01534 (JEB), ECF No. 347-2.

155. On July 22, 2021, PHMSA served on Energy Transfer LP a Notice of Probable Violation ("NOPV"), Proposed Civil Penalty, and Proposed Compliance Order, alleging probable violations of the Pipeline Safety Regulations at DAPL, including 49 C.F.R. §§ 195.254 (pressure relief), 195.401 (general requirements), 195.402 (procedures manual for operations, maintenance, and emergencies), 195.406 (maximum operating pressure), 195.428 (overpressure safety devices and overfill protection systems), and 195.440 (public awareness). Notice of Probable Violation (2021). Energy Transfer entered a consent agreement resolving the

violations: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2021-07/Energy%20Transfer-Dakota%20Access%2032021049NOPV_PCP%20PCO_07222021_%2821-211190%29.pdf.

156. Excessive pipeline pressure has been a recurring concern in DAPL's operation. *See Standing Rock Sioux Tribe, supra,* ECF No. 347-2, Fluid Flow Consultants, Independent Assessment; *DAPL Gathering System, DAPL Mainline and ETCOP Oil Pipeline Surge Analysis* (2017) ("Surge Analysis"), RAR017286–RAR017331. The 2017 Surge Analysis prepared by the operator's own consultant provided a serious warning with respect to compliance with PHMSA pressurization requirements. 49 C.F.R. § 195.406(b) - Maximum Operating Pressure.

157. A key recommendation in the surge analysis stated that every DAPL mainline pump station Programmable Logic Controller ("PLC") had to initiate pump shut down if it detected a mainline valve starting to close. Surge Analysis at 7. This included the Johnson's Corner Pump Station in North Dakota which is the starting point of the DAPL mainline and was the upstream station intending to provide surge protection for the Lake Oahe designated High Consequence Area ("HCA").

158. The 2017 Surge Analysis recommendation identified deficiencies that unless corrected, would result in excessive pressures [greater than 110% of Maximum Operating Pressure ("MOP")]. The pressure surge analysis at the Lake Oahe EFRD was termed "unacceptable."

159. Excessive pipeline pressure creates conditions that could cause a catastrophic pipeline failure and a large release. The risk is intensified by the ROD, which approves nearly doubling the DAPL flow rate from 570,000 to 1.1 million barrels per day. DAPL was operational at the time the surge analysis was issued. There is no evidence in the FEIS that the

recommendations in the 2017 analysis have been confirmed to be operational or performing as intended.

160. The 2017 DAPL Surge Analysis was performed at only 600,000 bpd, not at 1.1 million bpd. The 2017 surge analysis had instructed Energy Transfer to set the pumps at the Johnson's Corner origin facility upline from DAPL to the appropriate high discharge pump shutdown pressure, but this had not been done.

161. The nearly doubling of the DAPL flow rate approved in the ROD should trigger a new 1.1-million-BPD surge/transient analysis and performance verification specifically examining surge impacts of mainline valve closures such as the Lake Oahe EFRDs "deemed to be the worst in terms of highest surge pressures."

162. In the July 22, 2021 DAPL-related Notice of Probable Violation Compliance Order, PHMSA found "Energy Transfer failed to set its protective equipment at its Johnson's Corner pump station in accordance with its surge study to control the pressure from exceeding 110 percent of the Maximum Operating Pressure (MOP)." NOPV at p. 4. The FEIS noted its "concern" with the PHMSA Compliance Order findings. FEIS at p. 3-12. The Lake Oahe HCA had been operating for over two years without this important overpressure protective system in place until PHMSA ordered Energy Transfer to increase the pump shutdown pressure.

163. This history of deficiencies directly impacts the prevention and control of surge at the Lake Oahe DAPL crossing. The significant changes of nearly doubling the DAPL capacity, the recommended changes (if implemented) to the Johnson's Corner pump station shutdown initiation and high discharge pump pressure shutdown all make the importance of an updated surge analysis as addressed by PHMSA regulations even more urgent.

164. An updated flow study is needed to plan to mitigate the potential for excessive pipeline overpressure due to MLV closure (surge relief valves and automated pump shutdown via PLC monitoring of MLV position) at the Lake Oahe HCA and the other DAPL Horizontal Directional Drilling ("HDD") river crossings.

165. As a result of unresolved issues relating to over-pressurization and the increase in flow rate approved by the Corps, the FEIS fails to demonstrate that DAPL is operating in compliance with the pressurization requirements prescribed in 49 C.F.R. § 195.428(b), as well as PHMSA, *Pipeline Safety: Guidance for Pipeline Flow Reversals, Product Changes and Conversion to Service* 9-18-2014 ("Increasing throughput may also impact the pressure profile and pressure transients").

166. Since the EIS scoping process, the Tribe's reports and submissions to the Corps have consistently raised the serious safety threat of the lack of effective surge prevention and protection at the Lake Oahe site identified by the company's own consultant. The Tribe has received no response from the Corps.

167. The Lake Oahe crossing is a "high consequence area" under PHMSA's regulations due to the presence of drinking water sources, sensitive habitats, and populated Tribal communities. 49 C.F.R. § 195.450. "High consequence, low probability" events are a special elevated category of risk that cannot be managed with standard risk matrices and require special consideration of up-to-date pipeline safety standards and needed controls and verification of their performance.

168. As the operator of a hazardous liquid pipeline in a high consequence area, Energy Transfer is legally obligated to implement enhanced integrity management protocols, including with respect to leak detection and emergency flow restriction. *Id.* § 195.452.

169. DAPL is operating without meeting these mandatory requirements for leak detection and emergency flow restriction at the Lake Oahe crossing, and the defendants have permitted the pipeline to operate without employing "the limits of available technology" in the high consequence area, as required by regulation. 49 C.F.R. §194.5 Definitions.

170. DAPL and the Energy Transfer Crude Oil Pipeline ("ETCO") are treated as a single "Bakken Pipeline" system in Energy Transfer's 2025 reports to the U.S. Securities and Exchange Commission, and in PHMSA's database DAPL-ETCO holds a single Operator Primary ID under which all incident, integrity management, and enforcement data are reported.

171. DAPL-ETCO has experienced 18 spills to date (8-8-2026) since beginning operations in 2017, releasing 160 barrels (6,717 gallons) of crude oil and causing $260,022 in property damage not addressed in the FEIS analysis, including two spills defined by PHMSA as significant. DAPL-ETCO reported six spills that could have reached a High Consequence Area (HCA) like Lake Oahe, two spills where oil actually reached an HCA, and two large HCA spills that contaminated water - all as defined and reported to PHMSA but not identified by the Corps' FEIS. Three separate PHMSA enforcement actions against DAPL, all initiated in 2021, resulted in violations, fines, and warning letters; the FEIS mentions only one of the three.

172. From 2017 through 2024, Energy Transfer and its examined subsidiaries, including DAPL operator Sunoco Pipeline LP, compiled the worst overall spill record for hazardous liquid pipelines — considering spill numbers, significance, volume, property damage, enforcement cases, and penalties — among the pipeline corporate families with the most spills in PHMSA's database.

173. In the most recent three-year period, 2022 through 2024, Energy Transfer's performance deteriorated. In that period, Energy Transfer's hazardous liquid pipeline operations

yielded the most spills (91), the largest total spill volume (65,625 barrels; 2,756,838 gallons), the greatest property damage ($41,357,574), the most PHMSA-defined significant spills (44) and serious spills (2), and the most spills in water (15) among comparable operators. From 2022 to 2024, Energy Transfer's hazardous liquid pipelines had 12 spills exceeding 1,000 barrels; the next worst corporate operator had two.

174. Since 2025 to date, Energy Transfer has experienced two additional 1000-barrel spills including a 6600-barrel (277,000 gallons) spill in 2025 that resulted in significant economic and environmental impacts to the City of Fort Worth, Texas municipal wastewater treatment plant (PHMSA's emergency planning regulations treat a 1,000-barrel spill as one criterion for expecting "significant and substantial harm" to the environment. 49 C.F.R. § 194.103(c)(1)).

175. From 2017 through 2024, Energy Transfer and its subsidiary hazardous liquid pipelines were subject to the most enforcement actions (58) and the most fines collected ($3,926,990) compared to the other pipelines reviewed.

176. In October 2021, Energy Transfer LP and its subsidiary Sunoco LP were criminally charged in Pennsylvania for environmental violations during construction of the Mariner East pipeline, including the discharge of unauthorized drilling fluids. Additional criminal charges were filed in 2022 arising from an explosion on the Revolution pipeline caused by a failure to maintain environmental safeguards.

177. In August 2022, Energy Transfer LP and its affiliate entered no-contest pleas to 23 criminal counts, admitting to unauthorized waste discharges and repeated failures to report environmental incidents. *Commonwealth v. Sunoco Pipeline LP*, No. CP-22-CR-002685-2022 (Pa. Ct. Com. Pl. 2022). The convictions stemmed in part from over 176 spills of HDD drilling

fluid laden with unapproved toxic additives into environmentally sensitive lakes, rivers, and ground water of Pennsylvania — many of which were in PHMSA-defined High Consequence Areas (HCAs) like Lake Oahe — continuing even after warnings from the Pennsylvania Department of Environmental Protection. Sunoco Pipeline LP is a wholly owned subsidiary of Energy Transfer LP and the operator of DAPL.

178. As a result of the Pennsylvania Clean Water Act convictions, the Environmental Protection Agency issued a notice of debarment for both DAPL's parent company, Energy Transfer L.P., and DAPL operator Sunoco Pipeline LP, making them ineligible for federal contracts and operations, including easements in the interim. EPA's Suspension and Debarment Official acted upon a recommendation of the Debarment Council pursuant to the debarment authority of the Clean Water Act, 33 U.S.C. § 1368, and the governmentwide nonprocurement debarment regulations.

**IX. THE EIS PROCESS AND CONSULTATION FAILURES SINCE 2020**

179. The Corps published a Notice of Intent to prepare the Court-ordered EIS on September 10, 2020. The Notice described the scoping process, identified the alternatives to be evaluated in the EIS, and solicited public comment. *Notice of Intent To Prepare an Environmental Impact Statement for the Dakota Access Pipeline Lake Oahe Crossing*, 85 Fed. Reg. 55843 (Sept. 10, 2020).

180. On November 24, 2020, the Tribe submitted extensive scoping comments to the Corps. The comments identified 18 topics for which the Tribe requested detailed consultation and discussion, for inclusion in the EIS.

181. The Tribe requested consultation on whether DAPL would operate during the preparation of the EIS. The Corps summarily denied the request without discussion.

182. The Tribe requested that scoping and the initial steps of the EIS process be scheduled to allow for a public meeting on the Reservation once COVID-era restrictions eased. This was denied without discussion.

183. The Tribe requested disclosure of technical reports and other documents related to pipeline safety so that it could meaningfully participate in the NEPA process. Neither the Corps nor Energy Transfer produced any of the requested documents or information.

184. Throughout the EIS process, there was little or no substantive discussion of any of the priority issues identified by the Tribe in the scoping comments. The FEIS acknowledges this dismissively stating "the NEPA process does not dictate when consultation needs to occur in relation to scoping." FEIS at 1-18.

185. On December 30, 2020, Tribal Chairman Mike Faith, Jr. wrote to the then Commander of the Omaha District and asked that the Corps reconsider its scoping plan on account of the COVID 19 pandemic and lockdowns. Chairman Faith asked for an initial meeting for meaningful consultation, to discuss: (1) whether DAPL should continue to operate pending preparation of the EIS; (2) communication protocols for the preparation of the EIS; and (3) Tribal input into the procurement of any consultants by the Corps for preparation of the EIS.

186. The first meeting on the EIS between the Tribe and the Corps took place on January 31, 2021, nearly four months after the Corps started the administrative process, despite agency policy requiring consultation with Tribe "at the earliest planning stages." The meeting came after the Tribe pushed for a meeting and issued a December 30, 2020 request for consultation.

187. At that meeting, the Tribe was informed by Omaha district leadership that there would be no modification to the Corps' abbreviated scoping plan to address the Tribe's concern

that scoping meetings could not take place due to COVID. In addition, Corps officials stated that decisions concerning continued operation of DAPL during the NEPA process did not lie at the Omaha District level, and refused to provide any further information or discuss the merits of the Tribe's priority concern. Corps officials also refused to discuss its procurement of consultants for the EIS.

188. As early as February 21, 2018, when the Tribe submitted to the Corps the report entitled the *Impacts of an Oil Spill from the Dakota Access Pipeline on the Standing Rock Indian Reservation* (2018), the Tribe has requested additional information on the composition of the Bakken crude transported in DAPL, and unredacted copies of documents such as the Facility and Geographic Response Plans, for emergency response planning purposes.

189. Initially, the Tribe agreed to serve as a Cooperating Agency for the EIS, to attempt to assist the Corps with properly evaluating the risk to Treaty and trust-protected resources and to address emergency response from an oil spill. Tribal officials attended the cooperating agency meeting in April 2021, and were informed the Corps accepted the Tribe as a cooperating agency on Treaty rights and environmental justice concerns, not pipeline risk or emergency response planning. As a result, the Tribe subsequently withdrew as a cooperative agency.

190. The Corps and Tribe met on July 8, 2021. Tribal officials requested information about a forthcoming EIS. Corps officials responded to virtually none of the questions posed about the status of the EIS. On July 13, a Tribal official raised some of the questions via email, and the Corps responded in writing on August 3, 2021. The letter made no effort to collaborate, reach consensus or respond to the merits of issues raised by the Tribe.

191. Four days after the July 8 meeting, on July 12, 2021, the Corps circulated a document titled “administrative draft EIS” to the Tribe. During the July 8th meeting the Corps had declined to provide any information about the NEPA process or timeline for a draft EIS, yet the draft document provided was extensive and clearly prepared prior to the July 8th meeting.

192. On January 10, 2022, the Tribe renewed its request to review unredacted documents relating to DAPL emergency planning and pipeline safety via correspondence sent to the Corps. Tribal Chairwoman Janet Alkire requested copies of the updated Facility and Geographic Response Plans, RPS/Wood Group Spill Model, the DAPL Lake Oahe crossing worst case discharge calculation, the as-built drawings for the HDD drill, any updated risk assessment, the Integrity Management Plan, any updated surge analysis and protection plan, the DAPL Operations and Maintenance, Abnormal Conditions and Emergencies Manual, Management of Change documentation for the increase in flow rate, driller logs and incident reports for the HDD drill, and performance verification test results for safety critical functions.

193. Despite the Tribe’s repeated requests, renewed in the Tribe’s January 10, 2022 letter, none of the information was provided without significant redaction, if at all.

194. In the FEIS, the Corps incorrectly characterizes an inter-Tribal meeting on March 2, 2022 as a government-to-government consultation on DAPL. FEIS at 1-34. That meeting took place with defendant Telle’s predecessor, Michael Connor, who had recently been confirmed to his position, and who explicitly stated that the meeting would not be considered consultation, as he was brand new to the position and “still getting up to speed.” As with the two prior meetings the Tribe held with Corps officials, the repeated response to Tribal questions and concerns was “we’ll get back to you.”

195. The Tribe and Assistant Secretary of the Army - Civil Works met again on April 22, 2022. That meeting focused on the need for greater transparency and the production of unredacted documents for the Tribe to review, in order to meaningfully participate in the NEPA process. It did not reflect meaningful consultation. This discussion became very tense and unproductive, leading one Tribal leader, who entered the meeting hopeful for progress, to leave in tears.

196. On May 8, 2023, the Tribe sent a letter to then-Assistant Secretary Connor with the subject line: "Ongoing lack of genuine consultation, transparency and honesty by the Corps of Engineers in the NEPA process for DAPL." The letter emphasized the Tribe's priority concerns, nearly three years into the NEPA process:

> We have received none of the information requested about emergency plans to address an oil spill, the modeling of oil spill impacts on our Reservation, or other documents related to the safety of the pipeline. Virtually none of the issues raised in the 110-page Scoping Report submitted to the Corps of Engineers on November 24, 2020 are addressed in the Administrative Draft Environmental Impact Statement that has been circulated. Meanwhile, the Corps of Engineers has drained the Oahe Reservoir, causing our drinking water system to impose shortages… The Corps of Engineers itself has rendered the Facility and Geographic Plans unworkable…

*Id*.

197. The final "in-person consultation meeting" which the Corps claims in the FEIS, took place on May 11, 2023. FEIS at 1-34. This meeting focused on oil spill response planning, and the need for greater transparency. In particular, Tribal officials asked, in the event of an oil spill from DAPL, how the Corps' spill-response plans would address oil-soaked human remains in burial sites close to control point 1 in the 2017 Geographic Plan. Secretary Connor affirmed he had never thought of that and that the Corps would have to get back to the Tribe.

198. The Corps did not subsequently provide the Tribe an answer to that question before issuance of the FEIS. To date, the Corps has not yet addressed this concern.

199. On September 8, 2023, the Corps released the Dakota Access Pipeline Lake Oahe Crossing Project Draft Environmental Impact Statement. Up to that time and thereafter, there was virtually no substantive discussion between the Tribe and the Corps of the issues on which the Tribe had requested meaningful consultation in its 2020 scoping comments.

200. The Tribe attempted to work with the Corps on a consultative basis to ensure adequate opportunities for comment by Standing Rock Tribal members during the Corps public comment period on the draft EIS.

201. On November 8, 2023, the Corps held a public meeting on the Draft EIS in Bismarck, North Dakota — approximately 40 miles upstream from the crossing. The Corps rejected the Tribe's request to hold a public meeting in the Cannon Ball community, one-half mile downstream.

202. During a phone call on November 30 and by letter dated December 1, 2023, the Tribe requested that the Corps schedule a meeting for public comment in Cannon Ball community, one-half mile from the DAPL Lake Oahe crossing.

203. Defendant Sahl's predecessor, Mr. Newbauer, refused, and instead announced a virtual public meeting and virtual Tribal meeting. The Corps announced its virtual Tribal meeting for December 7, 2023 - at the exact same time as a different Tribal meeting previously arranged by the Corps' Omaha District to discuss reservoir levels and impacts to cultural sites during the 2024 hydrologic year.

204. Standing Rock representatives were unable to attend the December 7th virtual Tribal meeting on the Draft EIS because they attended a different Corps of Engineers' meeting

previously scheduled by defendant Sahl's predecessor, Mr. Newbauer, to discuss reservoir operations and the Corps' estimate that 169 cultural sites would be destroyed by erosion in 2024.

205. As alleged in the FEIS, the Corps claims to have sent a compact disc with documents requested by the Tribe on November 15, 2023. FEIS at 1-34. The documents provided were all highly redacted and contained no new information. The Corps stated that the redactions were necessary because the information "was under seal and in litigation." At the time, there was no active litigation and redactions far exceeded the information approved for redaction by this Court in 2017.

206. To date, no requested, unredacted information relied upon by the Corps has been made available to the Tribe. 40 C.F.R. § 1500.1(b) (2019).

207. On December 13, 2023, the Tribe submitted detailed comments on the Draft EIS, describing its concerns with the NEPA process and the findings of the Draft EIS, including inaccurate assertions of fact, findings unsupported by evidence, Treaty rights, scoping, impacts to cultural sites, the risk assessment methodology and findings of "remote possibility," the calculation of the worst case discharge, the operator's history of pipeline safety violations, subsurface movement of released oil, leak detection, disproportionate impacts and mitigation, the history of the area surrounding the crossing, the forced relocation of Tribal communities and resulting socioeconomic impacts and historical trauma, public safety and the safety of Native women, and DAPL's impacts on climate.

208. On August 26, 2024, Tribal Chairwoman Janet Alkire wrote to defendant Telle's predecessor and to defendant Sahl's predecessor requesting that the Corps re-open the public comment period to enable the Tribe to enter comment on environmental concerns related to the Exponent Report that provided information about non-existent returns resulting in 1.4 million

gallons of potentially contaminated drill mud and over 700 unreported frac-outs during the HDD construction under Lake Oahe in January-March 2017. The Tribe received no answer.

209. As a result of an incomplete EIS, the Tribe filed a federal lawsuit against the Corps in October 2024 to compel action on the environmental review process. The lawsuit was dismissed without prejudice in March 2025 and the Tribe appealed the decision to the D.C. Circuit in May 2025. Upon issuance of the ROD at issue in this case, the Tribe voluntarily dismissed the D.C. Circuit appeal in June 2026.

210. The Corps did not provide an opportunity for dialogue with the Tribe in 2025, contending it was busy responding to the extensive public comment received on the draft EIS.

211. Throughout 2025, despite active litigation and requests for information about the timing of a final EIS, the Tribe lacked any information on the status of the FEIS.

212. On December 19, 2025, nearly ten years after first authorizing the crossing, the Corps released the FEIS. That day, KFYR television in Bismarck, North Dakota announced the release of the FEIS on the DAPL Lake Oahe crossing. Michael Anthony, *Final Environmental Impact Statement for DAPL Easement Shows 'Remote' Chance of Leak Under Lake Oahe*, KFYR (December 19, 2025, 11:04 AM), https://www.kfyrtv.com/2025/12/19/final-environmental-impact-statement-dapl-easement-shows-remote-chance-leak-under-lake-oahe/. That is how Standing Rock Tribal leaders learned about the release of the FEIS.

213. On January 20, 2026, the Tribe submitted extensive comments in objection, together with its experts' Core Risk Management Deficiencies assessment.

214. In early 2026, the Tribe requested information about the timing of a Record of Decision. No information was provided by the Corps.

215. On May 20, 2026, North Dakota media outlet KFYR-TV aired a story that the "U.S. Army Corps decision on DAPL" was released but was quickly removed or taken down. Still, it was online long enough for Google servers to index the text of the story and display a summary that stated: "On May 20, 2026, the U.S. Army Corps of Engineers officially issued a Record of Decision (ROD) allowing the Dakota Access Pipeline (DAPL) to continue operations under Lake Oahe."

216. On May 21, 2026, before the Corps of Engineers posted the Record of Decision later that day, North Dakota Governor Kelly Armstrong released a statement celebrating the Record of Decision, stating: "U.S. Secretary of the Interior Doug Burgum announced the Corps' decision this morning at the Williston Basin Petroleum Conference in Bismarck. 'It's always fun to welcome Secretary Burgum back to North Dakota, and it's even better when he brings good news like this… today's announcement lifts the cloud of uncertainty over this essential piece of American infrastructure." North Dakota Office of the Governor, Armstrong Statement on U.S. Army Corps Releasing Record of Decision for Dakota Access Pipeline (May 21, 2026, 9:30 am), https://www.governor.nd.gov/news/armstrong-statement-us-army-corps-releasing-record-decision-dakota-access-pipeline. KFYR television broadcast and posted this information. Once again, that is how the Tribe learned of the Record of Decision.

217. As alleged above, the Corps decided the threshold question — whether DAPL would operate during the EIS — without any discussion with Tribal leaders; initiated scoping and identified the alternatives to be evaluated before government-to-government consultation; rejected the Tribe's requests for consultation on the procurement of consultants; refused to negotiate consultation protocols; refused to discuss the scope of the EIS, the flow rate to be evaluated, Treaty rights, risk methodology, and the worst case discharge; and left the Tribe's

repeated inquiries unanswered. Defendant Sahl's predecessor, Mr. Newbauer, repeatedly claimed ignorance of whether and how the Corps was addressing the Tribe's concerns in the EIS, and he and defendant Telle's predecessor Michael Connor would repeat "I'll have to get back to you."

218. The Corps' consultation with the Tribe throughout the completion of the EIS process on remand was procedurally deficient and substantively hollow. The Corps refused to discuss redactions and transparency, refused to discuss the scope of the EIS and the flow rate to be evaluated, failed to address Treaty rights, refused to discuss compliance with the U.N. Declaration on the Rights of Indigenous Peoples, refused to discuss the risk assessment methodology, and refused to consider changes to the calculation of the worst case discharge.

219. Defendant Sahl's predecessor, Mr. Newbauer, repeatedly claimed ignorance of whether and how the Corps was addressing the Tribe's concerns in the EIS, and he and defendant Telle's predecessor Michael Connor would repeat "I'll have to get back to you" and never did.

220. The Corps did not respond to numerous Tribal inquiries in 2024 and 2025 regarding the status of the EIS. No meaningful Nation-to-Nation dialogue occurred.

221. The resulting FEIS is devoid of substantive information on the impacts to the Tribe's water, cultural resources, sacred burial sites, treaty rights, and fish, wildlife, and plant habitat used by Tribal members for subsistence purposes.

## X. FEIS AND ROD DEFICIENCIES AND NEW MATERIAL EVIDENCE

222. Neither the FEIS nor the ROD resolves the controversies identified by this Court in ordering preparation of an EIS and vacating the 2017 easement — the calculation of the worst case discharge and the anticipated detection and shutdown time, leak detection 90 feet below the

bed of Lake Oahe, the operator's history, and oil recovery during winter conditions. *Standing Rock Sioux Tribe*, 440 F. Supp. 3d at 17–21.

223. The FEIS and ROD adopt the operator's calculation of a worst case discharge of 16,999 barrels at the 1.1 million bpd flow rate, relying on an assumed detection-and-shutdown time of approximately 12.9 minutes. FEIS, App. G at 30; *id.* at 3-38. That unsupported assumption is the basis of the estimated worst case discharge.

224. The actual worst case discharge into Lake Oahe is much higher than estimated by the Corps in the FEIS.

225. The assumed detection performance is inconsistent with the operator's documented record. The operator's historical operating record is the best available predictor of its future detection performance. The Tribe submitted evidence demonstrating repeated failures by Energy Transfer entities to timely detect releases, which was ignored by the Corps. The Corps never independently validated the detection assumption; it simply accepted Dakota Access's analysis.

226. The Corps' worst case discharge analysis also ignores prolonged sub-detection threshold and winter condition releases. A leak below the detection threshold of DAPL's leak-detection system at 1.1 million barrel per day flow rate, at the one percent threshold adopted by defendants, could release on the order of 11,000 barrels per day without detection; over a period of days, such a release would far exceed the declared worst case discharge. FEIS, at 3-53 (2025).

227. In support of its analysis, Defendant Corps of Engineers relied upon the following unsupported conclusion in the FEIS: "The likelihood of a slow release from the ND-380 valve site and pipeline was determined to be remote to unlikely." FEIS at ES-10. Failure to treat slow

pipeline leaks as credible flies in the face of both PHMSA regulations, the operator's history, and this Court's previous rulings.

228. With respect to leak detection, the Corps offered nothing new in the FEIS or ROD to resolve the controversy this Court identified in its prior rulings related to DAPL.

229. The FEIS relies on a risk-ranking methodology whose cited source — the United Kingdom Health and Safety Executive — had withdrawn the methodology or no longer endorses it for the purpose for which the Corps employed it. Despite repeated comments raising this defect, neither the FEIS nor its 1,167-page Response to Comments addresses it.

230. In the FEIS, the Corps likewise failed to grapple with evidence concerning American Petroleum Institute ("API") Recommended Practice 1173 (pipeline safety management systems), PHMSA's leak-detection research, the need for independent verification of the emergency flow restriction devices, actual operator detection performance, and the feasibility of response under ice-covered and low-water conditions.

231. In the FEIS, the Corps found that the environmental impact of an oil leak from DAPL is not significant because a slow leak is a remote possibility. FEIS at ES-10 to -13, ES-17 to -29. That finding rests on industry-wide statistics rather than on the performance of DAPL's operators. FEIS at 3-25 – 27. PHMSA's own database demonstrates that while the possibility of such an oil slow leak may be remote for other operators, it is not remote for Energy Transfer LP or Sunoco Pipeline LP.

232. Defendant PHMSA and the National Transportation Safety Board ("NTSB") describe significant pipeline spills as high consequence low probability events, not the "remote to very unlikely" language used by the Corps to dismiss the risk of a WCD or significant spill. PHMSA has "identified general weaknesses in the risk models" employed by companies in the

pipeline sector. PHMSA, *Pipeline Risk Modeling Overview of Methods and Tools for Improved Implementation*, 5 (2020). PHMSA issued a key recommendation "…it is important to consider high consequence scenarios even if they have a low probability of occurrence." *Id* at 57. PHMSA found that low probability, high consequence events demand special scrutiny and **"the overall risk maybe significant."** (emphasis added) *Id.* at 34,

233. In a rebuke to the Corps' dismissal of high consequence pipeline event risk, PHMSA warns that while most incidents do not involve a worst case pipeline spill "the anticipated level of consequences can be significantly underestimated." *Id.* at 55.

234. Rather than independently evaluate the prospect of a significant release of oil and its potential environmental impacts, the Corps relied extensively on information and assurances supplied by Dakota Access, *e.g*. FEIS at 3-31 ("Dakota Access had updated the GRP (p. 22) to clarify that improved boat dock ramps are not essential"), and on mitigation measures that the operator itself will implement and verify.

235. The ROD adopted material assertions from a February 22, 2026 Dakota Access submission that was never provided to the Tribe or the public before the decision.

236. The Corps' conclusions in the FEIS conflict with its own records.

237. The Corps stated, "[t]here have been no changes to the affected environment of surface water resources since the 2016 EA." FEIS at 3-83.

238. The Corps itself reports that the elevation of Lake Oahe on July 25, 2016, the date in which the Corps released the EA, was 1611.76 msl, which is flood stage. The Lake Oahe crossing and the spill response zone were a large surface-area reservoir. https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_25072016.pdf.

239. The Corps reports the elevation of Oahe on December 19, 2025, the date of the FEIS, was over 11 feet lower, at 1600.06 msl. https://www.nwd-mr.usace.army.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_19122025.pdf. The reservoir had reached this low elevation beginning in 2022, and, although the elevation fluctuates significantly, the Corps reports that the water level at Oahe has been at 1593-1600 msl consistently since 2022. At these lower elevations, the surface area and depth of the reservoir recede significantly, creating sandbars, side channels and snags, while the exposed lake bed emerges as thousands of acres of mud flats, with invasive forage proliferating. The affected environment has been altered significantly, through the actions of the Corps itself in operating Oahe Dam.

240. The Corps' finding in the FEIS that Energy Transfer's oil spill recovery plan will prevent significant or long-term damage to the environment is unsupported by the record and arbitrary and capricious within the meaning of the APA. The Fort Rice and Beaver Bay boat docks, the boat ramps relied upon to mobilize the extensive equipment identified in the FRP for oil spill clean-up on the surface of Lake Oahe are not, under current environmental conditions, available to mobilize the heavy equipment identified in the FRP.

241. Under current environmental conditions, response control points, and shoreline access locations identified in the response plans, are elevated above the water. The areas identified for the surface containment and collection of spilled oil are generally inaccessible by water. During site inspections documented in the administrative record, designated response ramps and control points were inaccessible or unusable for exactly these reasons.

242. The FEIS did not demonstrate that oil could be contained and removed under current low-water conditions or during Lake Oahe's annual ice cover. The FEIS's groundwater

conclusions, premised on releases too small to detect, likewise contradict the prompt-detection assumptions underlying the worst case discharge modeling.

243. The Corps also found no impacts to cultural sites, FEIS at 3-199 to 3-200, notwithstanding the destruction of 27 burials in September 2016 on land immediately adjacent to the Corps-managed land subject to the EIS, and notwithstanding the burials and cultural resources embedded in the response zone described below. The record contains no evidence that the Corps conducted any NHPA section 106 process beyond the minimal survey performed for the 2016 EA; the FEIS instead asserts that the 2016 State Historic Preservation Office concurrence "remains valid" for a new 25-year easement at doubled throughput.

244. The ROD acknowledges that a worst case discharge could result in moderate to major impacts to drinking water resources, aquatic ecosystems, wildlife, recreation, and Tribal interests, but concludes that those impacts are acceptable based largely on assumptions regarding the low probability of such an event and the anticipated effectiveness of mitigation measures.

245. The effectiveness of the plans for oil spill response is severely undermined by the failure to plan for the wide range of riverine conditions that exist at the DAPL Lake Oahe crossing, including the underestimate of the worst case discharge, the logistical difficulties to access the reservoir at low-water boat docks, the difficulties to navigate in this segment of Oahe, at depths of 1-3 feet, the fact that planned collection points for oil on the reservoir surface are de-watered (and have been for 5 years), and the operator's failure to make any meaningful effort to be transparent or cooperate with the Tribe and its Department of Emergency Management. There are on-going questions relating to the efficacy of the EFRDs, including whether a secondary power supply has been established, and whether full-stroke tests have ever occurred successfully.

246. The extensive redactions to the documents underlying the FEIS — including the Facility Response Plan, the Geographic Response Plan, and the spill model report — impeded Tribal and public participation in the preparation of the EIS. The FEIS's mitigation likewise adds nothing: it indicates that the Corps will require Energy Transfer to monitor water quality, but the Tribe's Department of Water Resources already does so, providing no actual improvement in leak detection or risk mitigation.

247. The pipeline the ROD approves is materially different from the pipeline this Court and the D.C. Circuit considered. The ROD authorizes operation at approximately 1.1 million barrels per day — nearly double the original capacity. Increasing throughput materially changes the risks of operation, including spill volume, hydraulic conditions, leak detection, emergency shutdown, and response capability.

248. API Recommended Practice 1173 requires a management-of-change review before implementing such a significant operational change.

249. A management of change review is particularly important where nearly doubling the pipeline capacity impacts several consequence multipliers that exist simultaneously including a high consequence area, a major water crossing, difficult or impossible to access response zones, potential severe seasonal low water or winter ice conditions affecting spill response, and the ineffectively evaluated overpressure and surge prevention and protection systems.

250. The FEIS identifies no independent management-of-change analysis evaluating whether the increased throughput affects the integrity management program, the leak-detection system, the emergency flow restriction devices, or the emergency response assumptions underlying the Corps' analysis.

251. The risk posed to the Tribe from the failure to properly evaluate the management challenges of increasing the flow of oil, through a management of change exercise, is magnified by the fact that Energy Transfer's own consultants, the Corps and PHMSA have all expressed concerns with pressurization *at the lower flow rate* of 570,000 barrels per day. The pressurization challenges increase significantly at the higher flow, but the record is devoid of any acknowledgment of these or other management issues arising from the increase in flow rate.

252. Before issuing the ROD, the Corps was aware that Energy Transfer had publicly announced plans to transport approximately 250,000 barrels per day of Canadian crude through DAPL as part of the Dakota Access North Project. Heavy Canadian crude and diluted bitumen present materially different operational and spill-response considerations than the Bakken crude analyzed in the FEIS: weathered diluted bitumen may submerge or sink, rendering the conventional surface containment and recovery methods on which the response plans rely significantly less effective. The Corps did not analyze this reasonably foreseeable change before authorizing the issuance of a 25-year easement; it deferred the analysis to a future easement condition.

253. The Corps' alternatives analysis counted speculative and non-jurisdictional effects against the removal, abandonment, and reroute alternatives, while invoking limitations on its authority and scope to exclude the foreseeable consequences of continued operation from the ledger on the other side.

254. The Mineral Leasing Act required the Corps, before granting the easement, to impose protections addressing water quality, environmental damage, public health and safety, and the interests of those who depend on area resources for subsistence. 30 U.S.C. § 185(h)(2). The Corps made no adequate findings concerning subsistence habitat in the spill zone, the

Tribe's reserved water rights, or the consequences of contaminating or disrupting access to those resources. The ROD's own conditions — deferring polycyclic aromatic hydrocarbon and fish-tissue chemical analyses and subsistence baseline studies until after the decision — confirm that the information required to make those findings was not before the agency when it acted.

255. Despite repeated inquiries, the defendants have ignored or refused the Tribe's requests for technical data and documentation regarding the drilling and installation of the pipeline, including records related to the environmental impacts of the 2017 drilling fluid release at the Lake Oahe crossing.

256. The ROD is a final agency action for which there is no adequate remedy at law, within the meaning of the APA. 5 U.S.C. § 704.

257. The Corps' decision was arbitrary, capricious, contrary to law, and issued without observance of procedures required by law. The Tribe does not ask this Court to substitute its scientific judgment for the Corps'. It asks the Court to enforce the procedural safeguards Congress enacted through NEPA, the NHPA, NAGPRA, the MLA, the CWA, and the APA by requiring the agencies to confront material evidence, explain their reasoning, and comply with mandatory statutory obligations before authorizing a 25-year easement beneath the Tribe's sole source of drinking water.

## XI. CULTURAL RESOURCES AND BURIALS IN THE SPILL RESPONSE ZONE

258. As alleged above, when the Corps impounded Lake Oahe it failed to carry out the cemetery relocation and mitigation duties imposed by Public Law 85-915. As a consequence — documented in the Corps' own 2004 Master Water Control Manual FEIS — thousands of cultural resources and human remains remain deposited in the bed and banks of Lake Oahe,

including at and around the DAPL crossing and throughout the downstream reach that the Corps' own spill modeling identifies as the path of released oil.

259. The recurring low-water conditions described above expose those banks and convert the reservoir margin into broad mud flats. Erosion and fluctuating water levels have already exposed human remains and cultural items along the reservoir, and continue to do so.

260. The facility response plans and the Geographic Response Plan approved and relied upon by the defendants prescribe spill response operations — excavation, berming, trenching, staging areas, boom anchoring, and the movement and operation of heavy equipment — on and along precisely those banks, shorelines, and mud flats. The Corps wrote, "[r]emediation activities could include in-situ remediation, excavation of contaminated soils, or both. Impacts (could include)... deep excavation to replace contaminated sediments…" FEIS at ES-11. In the event of a release, particularly under the low-water conditions that now routinely prevail, response crews would conduct emergency ground-disturbing operations, on an emergency timeline, in areas dense with burials and cultural items.

261. It is likely that spill response operations conducted under the approved plans would expose, disturb, damage, or destroy Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony located on Federal lands.

262. The Corps' own records document the presence and prior exposure of Native American burial sites and cultural items in the riverbed and along the banks and shorelines of Lake Oahe. The response operations prescribed by the FRPs and GRP include excavation, trenching, berming, staging, and operations of heavy equipment on those same banks, shorelines, and exposed mud flats. Based upon those previous studies and discoveries and the location and

nature of the prescribed response activities, spill-response operations in these areas are likely to result in the discovery or excavation of human remains or cultural items.

263. Neither the ROD, nor the 2017 or 2023 FRPs, nor the GRP contains a NAGPRA plan of action addressing spill response in these areas. There is no plan with discovery protocol, consultation procedure, historic-properties protocol, or notification to the Tribe's Historic Preservation Officer governing response operations in these areas. There is no record of such consultation. The defendants developed and approved the plans without consulting the Tribe, its Tribal Historic Preservation Officer, or lineal descendants concerning the treatment of remains and cultural items in the response zone.

264. The Corps limited the area of potential effects for its NHPA review to the immediate pipeline-crossing area and conducted no adequate traditional cultural property survey of the response zone.

265. The Tribe submitted to the Corps, and raised again in its January 20, 2026 FEIS letter, the scholarly report of Dakota W. Goodhouse, M.A., an enrolled member of the Standing Rock Sioux Tribe, documenting the extensive historical occupation, cultural significance, and traditional uses of the Missouri River bottomlands at and around the confluence of the Cannonball and Missouri Rivers. *The Cannonball River Occupations and Events for the NEPA Process by the Corps of Engineers for the Environmental Review of the Dakota Access Pipeline,* Dakota W. Goodhouse, M.A., November 1, 2023; Updated December 1, 2023. Drawing upon historical sources and evidence of longstanding occupation, including documented burials and other cultural resources, Goodhouse concluded the Cannonball-Missouri River confluence, the north bank of the Cannonball River at its mouth, and the surrounding floodplain qualify for nomination to the National Register of Historic Places.

266. The Goodhouse report provided the Corps with specific evidence that the cultural significance of the affected area extends beyond the individual archaeological sites to the broader landscape surrounding the confluence, including areas potentially affected by an oil spill and associated response activities. Notwithstanding this evidence, the Corps did not adequately evaluate the eligibility of the identified cultural landscape for inclusion in the National Register or meaningfully consult with the Tribe concerning its inclusion within the area of potential effects.

267. The Tribe also provided the Corps with correspondence from Dr. Thomas F. King, Ph.D., challenging the Corps' delineation of the area of potential effects and identifying the need to evaluate the broader cultural landscape surrounding the Cannonball-Missouri River confluence. *See* SRST Enclosure #10, included in FEIS Appendix B. The correspondence addressed the significance of the landscape to the Tribe and the need for meaningful consultation concerning the identification and evaluation of historic properties potentially affected by the undertaking.

268. The Corps likewise did not undertake consultation and planning as required by NAGPRA concerning the effects of response operations on the burials and cultural properties in the response zone.

## XII. IRREPARABLE HARM

269. DAPL has been operating since June 1, 2017 without a Facility Response Plan that complies with the requirements of the Clean Water Act and the applicable regulations, putting Tribal first responders and Reservation communities at a level of risk of harm above and beyond that deemed acceptable by Congress in the Clean Water Act, 33 U.S.C. §§ 1321(j)(5); and PHMSA in 49 C.F.R. §§ 194.105, 194.107, 194.115, 194.119.

270. The Missouri River at Lake Oahe is the Tribe's sole source of drinking water. A release of oil from DAPL would contaminate that supply, and the contamination of a sole-source water supply cannot be adequately remedied after the fact or compensated in money damages.

271. The Tribe's Treaty-reserved rights — including its reserved water rights and its rights to hunt, fish, and gather in and along the Missouri River — depend on the integrity of the river and its habitat. A release of oil is not a remote possibility, and it would directly impair those rights and the subsistence way of life they protect.

272. Experts that have reviewed the available documents have determined that DAPL is an unreasonably dangerous hazardous liquid pipeline.

273. Increasing the rate of flow intensifies the unreasonable risk of a significant release of oil affecting the Standing Rock Indian Reservation.

274. The burials and sacred sites embedded in the banks and mud flats of Lake Oahe are irreplaceable. Their disturbance or destruction — whether by a release of oil or by the emergency response operations the approved plans prescribe — would inflict permanent spiritual and cultural injury on the Tribe and its members that no remedy at law could redress.

275. The risks alleged herein are not speculative. They arise from a pipeline operating in violation of numerous pipeline safety regulations and standards, at nearly double its original capacity, run by the operator with the worst comparable safety record in PHMSA's database, across a reservoir whose routine low-water and ice conditions defeat the response measures on which the defendants rely.

276. Defendants' actions and omissions have caused and continue to cause irreparable injury to the Tribe.

277. The Tribe has no other adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of NHPA § 110(k)/APA — Grant of Assistance to an Ineligible Applicant (Against the Corps Defendants)

278. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

279. Section 110(k) of the NHPA prohibits a federal agency from granting a loan, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of NHPA Section 106, has intentionally significantly adversely affected a historic property to which the grant would relate, unless the agency, after consultation with the Advisory Council on Historic Preservation, determines that circumstances justify granting the assistance despite the adverse effect. 54 U.S.C. § 306113.

280. This restriction applies even when an applicant merely allowed the damage to occur when they had the legal power to prevent it. 54 U.S.C. § 306113.

281. The only time an agency may override this restriction and grant assistance is after formally consulting with the Advisory Council on Historic Preservation to determine that circumstances justify the action. *Id.* Consultation with the Council followed by a reasoned determination is the statute's only lawful path to granting assistance to an applicant that has engaged in intentional anticipatory demolition. *See, e.g., Rover Pipeline, LLC, and Energy Transfer Partners, L.P.*, 174 FERC ¶ 61,208, Docket No. IN19-4-000.

282. Between August 30 and September 2, 2016, Tribal cultural resources expert, Tim Mentz, Sr., identified previously undocumented burial grounds, stone features, and other historic cultural properties of exceptional significance to the Tribe within the pipeline corridor.

283. On September 2, 2016, the Tribe filed and served a declaration identifying the sites, explaining that imminent construction threatened their destruction. The declaration had accompanying maps with GIS coordinates identifying the location of the sites for their protection. The document was not filed under seal.

284. The following day, Dakota Access's contractors moved heavy construction equipment approximately twenty miles to the area identified in the Mentz declaration ahead of the construction schedule previously disclosed to public officials and conducted grading and excavation through the area identified in the declaration, destroying or significantly adversely affecting the burials, stone features, and identified historic, cultural properties.

285. The timing, location, and manner of the destruction - including movement of equipment over the Labor Day holiday weekend to the precise area identified by the Tribe immediately after Dakota Access received information identifying the historic properties, support the inference that Dakota Access intentionally caused or permitted significant adverse effects with intent to avoid the requirements of Section 106. 54 U.S.C. § 306113.

286. Alternatively, Dakota Access had legal power to prevent its contractors from causing those effects and allowed them to occur. 54 U.S.C. § 306113.

287. The historic properties adversely affected were burial and cultural sacred sites of unspeakable importance to the Tribe and were located within the DAPL corridor associated with the same pipeline undertaking for which the applicant, Dakota Access, sought and ultimately received authorization for a new easement under the 2026 Record of Decision. The new authorized easement thus constitutes assistance relating to the affected historic properties within the meaning of Section 110(k).

288. The Corps had notice of the September 2016 destruction, and notice of the presence of threatened sites beginning in August 2016 and repeatedly thereafter, including through the Mentz Declarations, the Edmondson letter, administrative comments, correspondence, and in previous litigation between the Tribe and the Corps. The Tribe repeatedly worked to notify the Corps that there were sites at issue in and near the ROW that would be affected by construction - all of which was ignored. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 24-2905 (JEB) (D.D.C. Oct. 14, 2024).

289. Notwithstanding a decade of notice, before authorizing the 2026 new easement, the Corps did not determine whether Section 110(k)'s prohibition applied to the September 3, 2016 destruction, including whether the destruction was undertaken with intent to avoid Section 106 review, and did not determine after consultation with the Advisory Council on Historic Preservation that circumstances justified granting the easement despite adverse effects pursuant to 54 U.S.C. §306113.

290. The Final EIS explicitly denies that DAPL construction resulted in the destruction of sacred sites and burial grounds identified by the Tribe. The FEIS's mention is minimal and the lack of space attributed to it in the FEIS, proportionately shows the lack of concern and general disregard the Corps has shown the Tribe with respect to DAPL construction and operation. The Corps' conclusion is inconsistent with the historical record, sworn declarations from Tribal cultural experts, and contemporaneous evidence submitted to the Corps and federal courts, and other evidence available to the Corps concerning the September 3, 2016 destruction and provided by the Tribe in its January 20, 2026 letter to the Corps regarding issues with the Final EIS.

291. In reaching that conclusion, the Corps relied upon assertions by Dakota Access and assessments by non-Tribal archaeologists, including then-North Dakota State Historic Preservation Office archaeologist Paul Picha and Dakota Access-contracted archaeologist Jason Kovacs. Yet publicly available sworn deposition testimony, described above in factual allegations, demonstrates material limitations in those assessments including an acknowledgment that a non-Tribal archaeologist is "not qualified to assess what is a tribal cultural property or not" and such assessments by outside archaeologists or by SHPO does not in fact determine whether a site constitutes a cultural, burial, or sacred site to the Tribe. The Corps nevertheless relies upon these underlying assessments and makes the bare assertion in both the FEIS and ROD that no sacred, burial, or cultural sites were destroyed. FEIS at 3-199 – 200; ROD at pg. 32-33.

292. The Corps could not lawfully avoid section 110(k)'s statutory requirements by declining to determine whether its prohibition applied despite the evidence before it. Its issuance of the ROD without the required inquiry, determination, and ACHP consultation was contrary to law and deprived the Tribe and the Advisory Council of the process Congress required.

293. The Record of Decision violates 54 U.S.C. § 306113 and constitutes final agency action that is arbitrary, capricious, contrary to law, and issued without observance of procedure required by law that must be set aside under 5 U.S.C. § 706(2)(A) and (D).

## COUNT II

## Violation of NAGPRA and the APA - Arbitrary and Capricious Authorization of Ground-Disturbing Response Operations in Burial Areas Without Consultation or a Plan of Action as Required by Law

## (Against the Corps Defendants)

294. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

295. The lands of the Lake Oahe flood control project at and downstream of the DAPL crossing are Federal lands within the meaning of NAGPRA. 25 U.S.C. § 3001(5). The defendants know — from the Corps' own records, including the 2004 Master Water Control Manual FEIS, from the history of Public Law 85-915, and from the Tribe's repeated submissions — that those lands contain Native American burial sites with human remains, funerary objects, sacred objects, and objects of cultural patrimony of the Tribe and its lineal descendants.

296. NAGPRA and its implementing regulations impose mandatory requirements governing Native American human remains and cultural items, including requirements applicable to federal activities that may result in their discovery or excavation.

297. Under 43 C.F.R. Section 10.4(b), a federal agency must prepare a plan of action before any planned activity on federally-managed lands that is likely to result in the discovery or excavation of human remains or cultural items. In determining whether discovery or excavation is likely, the agency must consider previous studies, discoveries, or excavations in the general proximity of the planned activity and must consult with the Tribe.

298. Responsible federal agencies must identify consulting parties, including the Tribe and lineal descendants, to invite and conduct consultation, and to prepare and approve a plan of action governing the treatment of human remains and cultural items that may be encountered. 43 C.F.R. §§ 10.2, 10.4(b)(1)-(b)(3), 10.4(c). Upon any discovery, the agencies must secure and protect the remains and items. *Id.* § 10.5; *Yankton Sioux Tribe*, 83 F. Supp. 2d at 1057.

299. A plan of action developed pursuant to Section 10.4 must address, among other things, the planned activity, the parties consulted, the Tribe's preferences regarding the treatment of human remains and cultural items, the applicable duty of care, procedures for notifying the

Tribe following a discovery and procedures for determining whether excavation is necessary and for disposition of human remains or cultural items.

300. The Corps has longstanding and specific knowledge that Native American human remains, burials, and cultural resources remain within federal lands comprising the Lake Oahe project, including at and around the location of the DAPL crossing.

301. When Congress authorized the taking of Standing Rock lands for the construction of the Oahe reservoir in 1958, Congress expressly directed the Secretary of the Army to "relocate and reestablish" Indian cemeteries, Tribal monuments, and burial sites within the taking area selected and designated by the Standing Rock Tribal Council and approved by the Secretary of the Interior. Pub. L. No. 85-915, Section 3, 72 Stat. 1762, 1763 (1958).

302. The Corps failed to fully carry out that statutory responsibility and those relocation efforts were not completed. Consequently, thousands of cultural resources and human remains are still within the banks and lands inundated by Lake Oahe, found in the riverbed today. The Corps itself has documented the continuing presence and vulnerability of these resources, including in and around where DAPL crosses the Missouri River and downstream areas potentially affected by an oil discharge. *See* U.S. Army Corps of Engineers, *Final Environmental Impact Statement, Missouri River Master Water Control Manual Review and Update* 3-167 to 3-168 (2004).

303. The presence of human remains and cultural items within the affected area is therefore neither speculative nor dependent upon an unknown future discovery. The Corps had actual knowledge, based upon its own studies and management of the Oahe project, that there are human remains and cultural resources important to the Tribe within the general proximity of the DAPL crossing and areas potentially affected by a discharge and response.

304. The ROD authorizes continued operation of DAPL across Lake Oahe for twenty-five years. Operation of the pipeline necessarily includes planning for and responding to a potential oil discharge. The ROD and the facility response plans approve and prescribe a planned activity on Federal lands at and downstream of the crossing, including excavation, berming, trenching, staging, removal of contaminated soil or sediment, and operation of heavy-equipment on the banks, shorelines, and exposed mud flats of Lake Oahe.

305. Those planned response activities overlap areas in which the Corps knows Tribal burial grounds exist including human remains and cultural items. In the event of a release — the very contingency the plans exist to address — and based on previous studies and discoveries in the general proximity, those operations are likely to expose, disturb, damage, or destroy human remains and cultural items. 43 C.F.R. § 10.4(b). These are reasonably foreseeable risks and consequences of a Record of Decision that authorizes a new easement.

306. The risk is heightened by existing conditions at Lake Oahe, including low water conditions that expose areas ordinarily under water. Any response to a spill would require spill response equipment and personnel to impact an already susceptible area.

307. The Tribe specifically raised this issue to the Corps during the administrative process. Among other things, Tribal representatives specifically asked Corps officials how ancestral remains within Lake Oahe would be treated if they were exposed to or contaminated by crude oil during a DAPL spill and subsequent response. The Corps stated that it would respond but did not provide the Tribe with an answer or a plan before issuing the FEIS, ROD, or authorizing a new easement. The Tribe is still waiting for a response to date.

308. Despite its knowledge of the location and vulnerability of these resources and the nature of the planned response activities, the Corps did not carry out the procedures required by NAGPRA and 43 C.F.R. pt. 10 before issuing the challenged ROD.

309. The Corps failed to determine, based upon the previous studies and known historical sites, whether activities reasonably contemplated in connection with the operation of the pipeline and emergency response are likely to result in the discovery or excavation of human remains or cultural items, through the process prescribed in and as required by 43 C.F.R. Section 10.4(b).

310. The Corps failed to identify and invite the required consulting parties to consult on a NAGPRA plan of action.

311. The Corps failed to actually consult with the Tribe and other required consulting parties concerning a NAGPRA plan.

312. The Corps failed to prepare the required record of consultation.

313. And finally, the Corps failed to prepare, through consultation with the Tribe, a NAGPRA plan of action addressing the protection and treatment of human remains and cultural items that may be discovered, exposed, excavated, removed, contaminated, or otherwise affected during emergency response to a DAPL spill before issuing the challenged ROD and authorized easement.

314. The Corps instead authorized a new twenty-five year easement authorizing continued operation of DAPL at Lake Oahe without resolving any of these questions and without complying with these requirements.

315. The Corps authorized and approved the planned response activity without identifying consulting parties, without inviting or conducting NAGPRA consultation with the

Tribe or lineal descendants, without preparing or approving any plan of action, and without incorporating any NAGPRA discovery, protection, notification, or consultation procedures into the ROD, the easement conditions, or the response plans.

316. The Corps acted arbitrarily and capriciously and not in accordance with law by authorizing the Lake Oahe crossing without addressing the known presence of burial sites in the areas potentially affected by a DAPL discharge and emergency response activities, despite the Tribe's specific request that the Corps explain how contaminated or disturbed human remains would be treated.

317. Emergency response conducted without a pre-established plan of action guarantees that NAGPRA's protections will be applied, if at all, on an emergency timeline by response crews with no protocol, no Tribal notification procedure, and no consultation — a framework designed to fail the statute's purpose of protecting Native American graves from excavation and disturbance.

318. To the extent the challenged ROD and the easement it authorizes fails to contain the protections required by Section 10.4 and 10.5, the Corps' authorization is contrary to NAGPRA and its implementing regulations.

319. By issuing the ROD without complying with the applicable requirements of NAGPRA, despite these known circumstances and the Tribe's request for information about emergency response, the Corps acted arbitrarily, capriciously, abused its discretion and acted otherwise not in accordance with the law.

320. The Corps' authorization and approval of the planned response activity without NAGPRA consultation and a plan of action was arbitrary, capricious, an abuse of discretion,

contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

321. The May 21, 2026 ROD and any authorized easement must therefore be set aside pursuant to 5 U.S.C. Section 706(2)(A) and (D).

**COUNT III**

**Violation of NEPA/APA — Failure to Cure the Deficiencies Identified by This Court and the D.C. Circuit on Remand**

**(Against the Corps Defendants)**

322. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

323. In 2020, this Court held that the Corps' environmental review of the Lake Oahe crossing violated NEPA because serious and unresolved expert controversy remained in four areas: 1) the calculation of the worst case discharge and the assumed detection and shutdown time; 2) the efficacy of DAPL's leak-detection system; 3) the operator's safety record; and 4) the feasibility of oil recovery during winter ice cover. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 17–21 (D.D.C. 2020). This Court ordered the Corps to prepare an EIS that will resolve those controversies. The D.C. Circuit affirmed. 985 F.3d at 1045–52 (D.C. Cir. 2021).

324. The FEIS and ROD fail to resolve the controversies relating to the environmental impacts of an oil spill from DAPL, and the degree of risk facing the Tribe.

325. When a court rules that an NEPA document is deficient, it is a determination that the agency failed to take a "hard look" as required by law regarding a specific issue. Merely repackaging the old analysis without resolving the court's explicit concerns means the agency

still hasn't satisfied its procedural duties. The Corps was legally bound by the law of the case to comply with this Court's order during the remand process.

326. Here, the FEIS and ROD do not resolve the first controversy.

327. Although the Corps characterizes the probability of a catastrophic spill as low, NEPA required consideration of reasonably foreseeable consequences of a spill where the risk is sufficiently concrete to bear upon the agency's decision. The D.C. Circuit previously held in prior litigation that the risk of a DAPL spill was sufficiently foreseeable that a person of ordinary prudence would take it into account in deciding whether to approve the pipeline's placement.

328. Instead, the worst case discharge adopted in the FEIS of 16,999 barrels at an increased throughput of 1.1 million barrels per day, rests on the exact same detection-and-shutdown assumption (approximately 12.9 minutes) that this Court found inadequate. In the FEIS and ROD, the Corps re-approved the 12.9 minutes detection-and-shutdown time, even though the operator has an extensive history of detection failures, and the regulation requires the calculation to rest on historic discharge data. 49 C.F.R. § 194.105(b)(1). The justification for the 12.9 minute-estimate has changed without explanation, casting further doubt on its validity under the APA.

329. Neither the ROD nor the FEIS demonstrate that the operator of DAPL has complied with the requirements for leak detection testing in PHMSA regulations and industry standards. 49 C.F.R. § 195.3(b)(7), API RP I1130, *Computational Pipeline Monitoring for Liquids* (2007) *reaffirmed* (2012), https://www.api.org/products-and-services/standards/important-standards-announcements/rp1130. The industry standard for the verification of leak detection systems requires liquid withdrawal testing, and PHMSA has incorporated API RP 1130 into its regulations. 49 C.F.R. § 195.3(b)(7). The Corps did not

include any information demonstrating that the requisite testing has been satisfactorily performed, or that DAPL complies with the requirements of 49 C.F.R. § 195.3(b)(7) and API RP 1130.

330. The FEIS and ROD do not resolve the second controversy. The Corps offered no new analysis of the capability of DAPL's leak-detection system to detect releases — including prolonged releases below the system's detection threshold — 90 feet beneath the bed of Lake Oahe.

331. The FEIS and ROD do not resolve the third controversy. The Corps, again, excused the operator's safety record — now materially worse than the record before the Court in 2020 — by characterization rather than analysis, without imposing corrective action or management-of-change requirements as prescribed by industry standards such as API Recommended Practice 1173.

332. The FEIS and ROD do not resolve the fourth controversy. Neither document contains new information or analysis of the risks and difficulties of oil recovery during winter conditions, and neither demonstrates that oil could be contained and recovered during Lake Oahe's approximately four months of annual ice cover.

333. In addition, as noted by the Tribe's response to the FEIS, if Canadian crude is a foreseeable change in operation, the Corps further dismisses this as creating any heightened risk without a management of change analysis, when the addition of heavy crude through the pipeline presents unique challenges to chemical composition, corrosion, risk management and oil recovery.

334. An EIS prepared on remand that fails to cure the specific deficiencies that required its preparation does not satisfy NEPA, and a decision resting on it is arbitrary and

capricious. The Record of Decision and any authorized easement therefore violate NEPA and the APA. 5 U.S.C. § 706(2)(A), (D).

**COUNT IV**

**Violation of NHPA § 106/APA — Exclusion of the Spill Response Zone from the Area of Potential Effects and Failure to Identify Historic Properties and Consult**

**(Against the Corps Defendants)**

335. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

336. Section 106 required the Corps, before granting the easement, to determine the area of potential effects ("APE") of the undertaking, identify historic properties within it, evaluate effects on them, and resolve adverse effects. 54 U.S.C. § 306108; 36 C.F.R. §§ 800.3–800.6, 800.16(d).

337. As part of that process, the Corps was required, in consultation with the Tribe, to determine and document the undertaking's area of potential effects, review existing information concerning known and potential historic properties within that area, seek information from consulting parties and the Tribe, and make a reasonable and good-faith effort to identify historic properties that may be affected. 36 C.F.R. §§ 800.4(a)-(b).

338. The APE encompasses the geographic area or areas within which the undertaking may directly or indirectly alter the character or use of historic properties. 36 C.F.R. § 800.16(d). Its scope is determined by the scale and nature of the undertaking and may differ for different kinds of effects caused by the undertaking. *Id.*

339. For Tribal cultural properties, 54 U.S.C. § 302706 separately requires consultation with a Tribe attaching religious or cultural significance to qualifying properties.

340. The undertaking here was the Corps' preparation of an EIS and issuing of a ROD authorizing the approval of a new twenty-five-year easement authorizing continued operation of DAPL beneath Lake Oahe at approximately 1.1 million barrels per day. The reasonably foreseeable effects of that undertaking are not confined to the physical footprint of the pipeline crossing.

341. The Corps' own analysis and spill modeling predicts that oil released at the Lake Oahe crossing may travel to downstream areas potentially affected by such a release. The response plans relied upon in the FEIS prescribe response and remediation activities in those areas, including excavation, berming, staging, and heavy-equipment operation along banks and mud flats of Lake Oahe.

342. Those response activities themselves have the potential to physically alter or destroy historic properties and therefore constitute potential effects that the Corps was required to consider in determining the geographic scope of the APE.

343. The Corps knew from its own records and management of Lake Oahe that the banks, shorelines, mud flats, and reservoir bed within the spill-response area contain Tribal burials and cultural resources, and that erosion and fluctuating reservoir levels continue to expose such resources.

344. Nevertheless, the Corps limited its Section 106 review to the immediate pipeline-crossing area, excluded the downstream spill-response area from the APE, failed to make a reasonable and good faith effort to identify historic properties within that area, and failed to consult with the Tribe and its Tribal Historic Preservation Officer concerning the identification of those properties and the effects of spill response operations.

345. Instead, the FEIS relied upon the 2016 State Historic Preservation Officer's concurrence associated with the 2016 review and asserted it "remains valid" for a new 25-year easement at doubled throughput.

346. By defining the APE so as to exclude the very areas its own analysis identifies as subject to the undertaking's foreseeable effects to historic properties, and by failing to undertake the identification and Tribal consultation required by 36 C.F.R. § 800.4, the Corps failed to comply with Section 106 before issuing the ROD and authorizing a new easement.

347. The Corps may not substitute a decade-old concurrence for the consultation and identification the statute requires. *Cf. Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520 (D.C. Cir. 2018).

348. The Corps' issuance of the Record of Decision authorizing the easement notwithstanding those failures is arbitrary, capricious, an abuse of discretion, contrary to law and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

**COUNT V**

**Violation of CWA § 311(j)(5) and 49 C.F.R. Part 194 — Arbitrary and Unlawful Approval of the DAPL Facility Response Plans**

**(Against the PHMSA Defendants)**

349. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

350. Section 311(j)(5) of the Clean Water Act requires the operator of an onshore facility that could reasonably be expected to cause substantial harm to prepare a plan for responding, to the maximum extent practicable, to a worst case discharge and a substantial threat of such a discharge. 33 U.S.C. § 1321(j)(5)(A). A "worst case discharge" is the largest foreseeable discharge in adverse weather conditions. Id. § 1321(a)(24).

351. For an onshore facility that could reasonably be expected to cause significant and substantial harm, the reviewing agency must promptly review the response plan, require amendments to any plan that does not satisfy the statutory requirements, approve a plan that does satisfy those requirements, and periodically review the plan thereafter. *Id.* § 1321(j)(5)(E).

352. PHMSA implements these requirements for onshore oil pipelines through 49 C.F.R. Part 194. Part 194 requires an operator to determine the worst case discharge for each response zone and provide the methodology, including calculations, supporting that determination. 49 C.F.R. § 194.105(a). The calculation prescribed by § 194.105(b)(1) includes maximum release time and maximum shutdown response time, based on historic discharge data or, in the absence of such data, the operator's best estimate, multiplied by maximum flow rate, plus the largest line-drainage volume after shutdown.

353. The operative DAPL Facility Response Plan does not satisfy these requirements. Its worst case discharge in the plans PHMSA approved is not a realistic calculation. The discharge calculation relies upon detection-time input and shutdown assumptions that are inconsistent with the operator's own historic discharge data, including a documented 12-day detection failure - far exceeding the detection time assumed for DAPL. The rupture-focused calculation also ignores prolonged sub-threshold releases, which at the approved flow rate could release volumes far exceeding the declared worst case discharge over a period of days without detection. § 194.105(b)(1).

354. The response plan also fails to adequately provide for response to a worst case discharge under the environmental conditions prevailing at Lake Oahe. Part 194 requires an operator to identify and ensure the availability of resources to remove, to the maximum extent practicable, a worst case discharge and to mitigate or prevent a substantial threat of discharge. 49

C.F.R. § 194.115. Part 194 expressly identifies ice conditions and other environmental conditions such as low-water conditions that have prevailed routinely since 2021, as adverse weather. *Id.* § 194.5.

355. As alleged above, recurring low water conditions at Lake Oahe render or may render access control points identified in the FRP inaccessible or unusable, including locations separated from the water by exposed lake bed and mud flats. Shallow water, sandbars, and side channels further impede navigation and deployment of response equipment. Lake Oahe is also covered by ice for approximately four months each year, substantially limiting the ability to locate, contain, and recover released oil using the surface-response techniques identified in the plans.

356. Material operating conditions and information have also changed since approval of the original response plan. DAPL's throughput has increased from approximately 570,000 barrels per day to approximately 1.1 million barrels per day; persistent low-water conditions have materially altered access to response locations at Lake Oahe; and Energy Transfer has announced plans involving transportation of substantial quantities of Canadian crude through DAPL. As the Tribe noted in its January 20, 2026 comments objecting to the FEIS, the proposed transportation of Canadian crude represents a potentially significant operational change warranting further scrutiny because differences in crude characteristics may affect pipeline operation, integrity, chemistry, spill response, and warrant management of change review under applicable industry practices.

357. Part 194 requires an operator to update its response plan to address new or different operating conditions or information. When such conditions or information would

substantially affect implementation of the plan, the operator must immediately modify the plan and submit the change to PHMSA. 49 C.F.R. § 194.121.

358. The plans are not consistent with the National Contingency Plan and the applicable Area Contingency Plan. Among other inconsistencies, they contain no historic-properties protocol, no procedure for notification of the Tribe's Historic Preservation Officer, and no NAGPRA-compliance procedures for response operations prescribed on banks and mud flats containing burials and cultural items. Defendant PHMSA also failed to consult with the Tribe, even though activities authorized in the plan take place on the Tribal and federally-managed lands on the Standing Rock Indian Reservation.

359. A facility response plan that does not satisfy the statutory and regulatory content requirements, does not comply with section 311(j)(5), and its approval is unlawful.

360. Notwithstanding the deficiencies and changed conditions alleged above, PHMSA approved the 2023 Facility Response Plan and has permitted that approval to remain operative. PHMSA thereby approved a response plan that fails to satisfy the requirements of CWA § 311(j)(5) and 49 C.F.R. Part 194.

361. PHMSA's approvals of the 2023 FRP constitutes final agency action that is arbitrary, capricious, an abuse of discretion, and contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

362. Section 311(j)(5)(F) provides that an onshore facility required to prepare a response plan may not transport oil unless a required plan has been approved and the facility is operating in compliance with that plan. 33 U.S.C. § 1321(j)(5)(F).

363. The Tribe is therefore entitled to an order setting aside PHMSA's unlawful approval of the operative DAPL Facility Response Plan, enjoining operation of the Lake Oahe

segment unless and until a compliant plan is approved, and granting such further relief as is necessary to enforce the requirements of CWA § 311(j)(5).

## COUNT VI

### Violation of the Administrative Procedure Act - Arbitrary and Capricious Action and Failure to Consider Material Tribal Concerns

### (Against the Corps Defendants)

364. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

365. Under the Administrative Procedure Act, a reviewing court shall set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious where the agency fails to consider an important aspect of the problem, fails to consider material information before it, or fails to articulate a rational connection between the facts found and the decision made.

366. The Corps' decision whether to grant a new easement authorizing DAPL to cross Lake Oahe directly implicates the Standing Rock Sioux Tribe's Treaty rights, trust resources, cultural and sacred sites, water supply, and other resources relied upon by the Tribe for subsistence.

367. As alleged herein, the Tribe repeatedly presented the Corps with information and concerns bearing directly on those interests throughout the Corps' preparation of the EIS and consideration of the easement.

368. The United States' government-to-government relationship with the Tribe is grounded in the Fort Laramie Treaties of 1851 and 1868. Article V of the 1868 Treaty commits the United States to maintain an agent among the Tribe "for the purpose of prompt and diligent

inquiry" into matters presented under the Treaty. Treaty of Fort Laramie, Apr. 29, 1868, art. V, 15 Stat. 635, 636. Article XI separately mandates the establishment of a commission — to include a Tribal head man — before "works of utility or necessity" could be authorized through Treaty lands. *Id*. at 638. The 1868 Treaty provides for Tribal representation in determining compensation for damages caused by such works and for consultation on infrastructure projects crossing Treaty lands. *Id.*

369. Consistent with the federal government's Nation-to-Nation relationship with Tribal Nations, Executive Order 13,175 reinforces these Treaty obligations, directing agencies to respect Tribal self-government and sovereignty, honor treaty rights, and establish procedures to ensure meaningful and timely input by Tribal officials. Exec. Order No. 13,175, 65 Fed. Reg. 67249 (Nov. 9, 2000).

370. The Corps' Tribal Consultation Policy likewise provides for an "[o]pen, timely, meaningful, collaborative and effective deliberative communication process" in which "consultation works toward mutual consensus and begins at the earliest planning stages, before decisions are made and actions are taken." U.S. Army Corps of Eng'rs, *Tribal Consultation Policy* (2013), updated in 2023.

371. The Corps did not adhere to those consultation standards in the decision making process culminating in the FEIS, ROD, and authorization of a new DAPL easement. Before its first EIS consultation meeting with the Tribe, the Corps had already initiated scoping, established the scoping schedule, identified alternatives for consideration, and determined that DAPL would continue operating during preparation of the EIS.

372. As described herein, the Tribe requested consultation repeatedly concerning continued operation, procurement of consultants, pipeline safety, low-water impacts on spill

response, emergency response plans, destruction of cultural and sacred burial sites, but those matters were not substantively discussed before the Corps proceeded with the final EIS.

373. The Tribe repeatedly sought information necessary to evaluate matters central to the Corps' easement decision. Among other things, the Tribe requested unredacted Facility and Geographic Response Plans, spill modeling, the worst-case discharge calculation, pipeline risk assessments, information concerning increased flow rate, and other pipeline safety and emergency response information. As alleged above, the Corps either did not provide that information or provided materially redacted documents that rendered them useless and prevented the Tribe from reviewing the underlying information upon which the Corps relied.

374. Throughout the EIS process, the Tribe repeatedly raised substantive concerns regarding pipeline risk, emergency response, the worst-case discharge calculation, the increased flow rate, Treaty rights and Treaty-protected resources, cultural and sacred sites, burial sites and human remains, impacts to the Tribe's water supply, and impacts to fish, wildlife, plants and other resources relied upon by Tribal members.

375. The Corps failed to adequately engage with the Tribe and fulfill its consultation obligations of meaningful government-to-government dialogue, often outright ignoring the Tribe's requests for communication and meetings, as well as material evidence relevant to the decision making process. As alleged above, the Tribe received no response to its August 2024 request to reopen the comment period to address new information concerning the HDD construction, pipeline safety, and water quality. No substantive government-to-government dialogue concerning the EIS occurred during 2025. The Tribe repeatedly sought information concerning the status and timing of the FEIS and ROD and even that basic information was withheld or received no substantive responses, with the oil industry, news media, and state

governments learning about both the FEIS and ROD before the Tribe ever did. Tribal leaders ultimately learned of both final agency actions through media reports rather than through government-to-government communication from the Corps.

376. The Corps' consultation process was therefore not merely deficient because the Corps ultimately disagreed with the Tribe. Rather, the Corps repeatedly proceeded with material stages of its decision making without substantively engaging the Tribe concerning issues the Tribe had identified as bearing directly on its Treaty rights, trust resources, water, cultural resources, burial sites, subsistence resources, and the consequences of an oil spill at Lake Oahe.

377. These failures affected the substance of the Corps' final decision. Despite the Tribe's repeated presentation of these concerns, the FEIS and ROD failed to meaningfully address material issues raised by the Tribe. The Corps allowed DAPL to continue operating illegally without a proper permit for nearly ten years and without a completed EIS. Tribal concerns about pipeline safety, water supply, and Treaty rights went ignored. The Corps therefore failed to consider important aspects of the easement decision and material information before it.

378. Consultation was treated as an after-the-fact procedural step, rather than as an integral part of decision making beginning before decisions are made, and is not the consultation the Treaties, the Corps' own policy, or the trust responsibility require. The absence of meaningful consultation produced an FEIS devoid of information critical for Tribal subsistence and safety.

379. The Corps' conduct of the consultation process, and its issuance of the ROD and authorized new easement without meaningful government-to-government consultation and notwithstanding the material information provided by the Tribe and requested by the Tribe, and

ignoring serious deficiencies was arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

380. The ROD and authorization for a new easement should therefore be set aside pursuant to 5 U.S.C. § 706(2).

## COUNT VII

## Violation of MLA § 185(h) and the APA — Failure to Make Subsistence and Water-Rights Findings and to Impose Required Protective Stipulations

## (Against the Corps Defendants)

381. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

382. Section 185(h)(2) requires the agency granting a right-of-way to impose stipulations that include requirements to ensure that activities connected with the right-of-way do not violate applicable water-quality standards; requirements designed to control or prevent environmental damage, including damage to fish and wildlife habitat, and hazards to public health and safety; and requirements protecting the interests of persons living in the general area who rely upon fish, wildlife, and biotic resources for subsistence purposes. 30 U.S.C. § 185(h)(2)(B)-(D).

383. The MLA conditions any easement on the agency's compliance with NEPA, 30 U.S.C. § 185(h)(1), and on stipulations protecting water quality, preventing environmental damage, and protecting the interests of individuals who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes. *Id.* § 185(h)(2)(B)–(D).

384. Members of the Tribe rely upon the fish, wildlife, and biotic resources of Lake Oahe and the surrounding area for subsistence. The Tribe holds Treaty-reserved water rights in the Missouri River and relies upon the Missouri River for its drinking water.

385. The ROD and any authorized easement fail to impose stipulations adequate to protect those interests from the reasonably foreseeable consequences of a DAPL release. The ROD's own conditions — deferring the polycyclic aromatic hydrocarbon and fish-tissue chemical analyses and subsistence baseline studies to the post-decision period — concede that the information required for the § 185(h)(2) findings was not before the agency when it approved the ROD.

386. The issuance of a ROD authorizing the grant of a 25-year easement without the findings and stipulations § 185(h)(2) requires was arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

**COUNT VIII**

**Violation of NEPA and the APA — The Failure to Evaluate Impacts to Treaty-Protected Tribal Resources, Tribal Lands, and Subsistence Uses**

**(Against the Corps Defendants)**

387. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

388. In section 101 of NEPA, Congress declared it the "national environmental policy… to assure for *all* Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings (and) preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b)(2) & (4) (emphasis added). This is the statutory basis in NEPA that requires agencies to evaluate the disproportionate impacts to Tribal, minority, and low-income communities under the principles of environmental justice.

389. Section 102(2)(C) of NEPA requires federal agencies, prior to approving a major federal action affecting the quality of the human environment, to prepare a detailed statement

identifying all environmental impacts of the proposed action. This section of the statute requires agencies take a "hard look" at the impacts of the proposal on human, environmental and cultural resources. *E.g. Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

390. On June 14, 2017, this Court ruled that the Tribe's Treaty-guaranteed hunting and fishing rights and environmental justice concerns, along with unresolved controversy over environmental impacts, were not adequately addressed in the Corps' 2016 Environmental Assessment. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.Supp.3d 101, 132-34, 136-49 (D.D.C. 2017).

391. On March 25, 2020, in holding that the 2016 EA failed to comply with NEPA, this Court did not rule on whether the Corps had remedied the failures in the EA to properly evaluate the Tribe's Treaty-protected hunting and fishing rights and environmental justice considerations. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F.Supp.3d at 26.

392. The Corps' decision approving the ROD and Energy Transfer's construction of DAPL and related facilities have resulted in disproportionate negative impacts to the tribal elder population, who have suffered long-term and repeated impacts resulting from the Corps' actions, including during the relocation of communities in order to facilitate the construction of Lake Oahe up through the approval and construction of DAPL in and above the Standing Rock Sioux Reservation's water supply.

393. Under NEPA, agencies approving federal actions that affect Indian trust land or resources are required to identify the environmental impacts of the action on those resources. *E.g. Davis v. Morton*, 469 F.2d 593, 597 (10th Cir. 1972).

394. Under the regulations that apply to the FEIS, the environmental consequences to be evaluated include "[p]ossible conflicts between the proposed action and the objectives of

federal, regional, state and local (and in the case of a reservation, Indian tribe) land use plans, policies and control for the area covered." 40 C.F.R. § 1502.16(c) (2019).

395. The Corps' taking of riparian land on the Standing Rock Indian Reservation did not include acquisition of the bed of the Missouri River, which, beginning at the point where the Cannonball River flows onto the bed of Missouri River and downstream to the southern boundary of the Standing Rock Reservation, remains held in trust by the United States for the Standing Rock Sioux Tribe and individual allottees.

396. The United States holds naked legal trust title to Indian trust land, while the Tribes and individual Indian land owners hold "beneficial ownership" of land and resources. *United States v. Shoshone Tribe*, 304 U.S. 111, 115-117 (1938); *see also* 25 U.S.C. § 5102.

397. The property rights of the Standing Rock Sioux Tribe and Tribal members could be directly and adversely affected by an oil spill from DAPL, resulting in extensive liability on the part of the United States, as trustee for the Tribe, and Energy Transfer LP, as the operator of DAPL.

398. In the FEIS, the Corps failed to identify the subsurface Tribal and individually-owned Indian mineral rights on the riverbed, or the environmental impacts and the resulting long-term economic liabilities from an oil spill.

399. In the FEIS, the Corps fails to identify the location of Tribal property rights on and below the bed of the Missouri River that could be affected by an oil spill from DAPL, the potential environmental impacts or the potential long-term economic liabilities to the Tribe and Tribal members.

400. The environmental and socioeconomic impacts of an oil spill from DAPL could extend beyond the bed of the Missouri River and the Corps' taken area at the water's edge, to Tribal and allotted land above the Corps-administered land.

401. The community of Cannon Ball is located at the northern boundary of the Reservation at the confluence of the Cannon Ball and Missouri River, one-half mile from the DAPL Lake Oahe crossing.

402. The Tribe's Cannon Ball Unit irrigation project is located south and west of Cannon Ball community. The project's intake at Lake Oahe is just downstream of the community.

403. Tribal members gather natural foods and medicinal and ceremonial plants in the draws and other areas, below and downstream of Cannon Ball community.

404. Tribal members fish and hunt waterfowl for subsistence food below and downstream of Cannon Ball community, and hunt game in the draws farther downstream. Actions by the Corps through the approval of the ROD and by Energy Transfer in construction of DAPL and related facilities, including pump stations, have negatively impacted nesting migratory waterfowl and Tribal members' ability to maintain their subsistence hunting practices.

405. Current Tribal land use plans and policies provide for the protection and enhancement of residential development in the Cannon Ball community street grid; agricultural use in the uplands surrounding the community; and subsistence gathering in draws and remaining riparian areas.

406. In the FEIS, the Corps identified fish and wildlife species located on Reservation lands and of special concern to the Tribe, per the Tribe's submittal, but the Corps failed to identify potentially impacted habitat, ignored or understated the potential toxicity and mortality,

and undertook no follow-up analysis of impacts to the list of species supplied by the Tribe from an oil spill from DAPL.

407. In the FEIS, Corps identified a list of plant species of significance, provided by the Tribe in 2020 during the scoping period. On December 13, 2023, during the public comment on the draft EIS, the Tribe provided a supplemental list of plant species that are harvested by Tribal members. In the FEIS, the Corps failed to identify the plant species identified by the Tribe in its submittal on December 13, 2023.

408. Although the Tribe submitted two lists of plant species and requested that the Corps evaluate impacts of an oil spill on these species, in the FEIS, the Corps has failed to identify habitat for the medicinal plants and natural fruits identified by the Tribe. The FEIS lacks evaluation of the potential impacts of an oil spill to the plant species identified, or analyze the potential reduction in their availability to Tribal members, and the public health impacts to Tribal members that could result.

409. In the FEIS, the Corps failed to identify the conflict between the Tribe's residential, agricultural, hunting, fishing and gathering land uses, and the approval of an easement for the operation of DAPL immediately adjacent to these Tribal land uses.

410. Notwithstanding the admonition of this Court to remedy the inadequate analysis of the impacts of an oil spill on hunting and fishing rights on the Reservation and environmental justice, this FEIS contains little or no new analysis of these issues.

411. The ROD is arbitrary and capricious, constitutes an abuse of discretion and is contrary to law within the meaning of the APA, 5 U.S.C. § 706(2)(A), as it is not supported by an EIS that identifies impacts to Tribal trust land and mineral estates, or hunting, fishing and gathering land uses on the Standing Rock Indian Reservation, as required under NEPA and the

applicable regulations,40 C.F.R. § 1502.16(c) (2019), and prior directives of this Court. *Standing Rock Sioux Tribe*, 255 F.Supp.3d at 132-34, 136-49.

**COUNT IX**

**Violation of NEPA/APA — Arbitrary and Capricious Record of Decision Due to Reliance on Unsupported Assumptions, Failure to Take Hard Look, and Consider Reasonable Alternatives**

**(Against the Corps Defendants)**

412. The Tribe realleges and incorporates the foregoing paragraphs as though fully set forth herein.

413. NEPA required the Corps, before issuing the challenged ROD and authorizing a new easement, to take a hard look at the reasonably foreseeable environmental effects of the proposed action, ensure the professional and scientific integrity of its analysis, and rely upon reliable data and resources, including disclosure and response to opposing scientific and technical views.42 U.S.C. §§ 4321 et seq.; *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971); *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499 F.2d 1069, 1082-83 (D.C. Cir. 1974).

414. The Corps knew that the consequences of a spill at Lake Oahe depend materially upon the amount of oil released before detection and shutdown and the ability to contain and recover that oil.

415. During the environmental review process, the Tribe and its experts submitted detailed evidence challenging the assumptions underlying the Corps' spill analysis, including the 12.9-minute assumed detection and shutdown time, the validity of the risk-ranking methodology used throughout the FEIS, the reliability of DAPL's automated leak-detection system, the anticipated effectiveness of the emergency flow restriction devices, the operator's safety history, and the feasibility of responding to an oil spill in winter, ice, drought, and low-water conditions.

*See* Tribe's January 20, 2026 comments in opposition to the FEIS and the accompanying *Core Risk Management Deficiencies* assessment.

416. Among other matters, the Tribe's experts explained that the risk matrix underlying the Corps' findings relied on a methodology that the Corps' own cited source, the United Kingdom Health and Safety Executive, had withdrawn or no longer endorsed for the purpose for which the Corps employed it. *See* January 20, 2026, FEIS letter, Core Risk Deficiencies.

417. In the FEIS, the Corps determined that a worst case discharge or other significant release of oil at Lake Oahe "is remote or very unlikely." FEIS at ES-10. That conclusion is based on industry-wide statistics, not statistics applicable to the operator of DAPL, and on the risk assessment methodology that has been discredited and withdrawn.

418. The Tribe and its experts also presented evidence concerning API Recommended Practice 1173, the most recent version of API 1160, PHMSA's leak-detection research, the need for independent verification of the emergency flow restriction devices, and Dakota Access's documented operating and detection record. *Id.*

419. These submissions raised material questions concerning the foundational assumptions used to classify spill risk and predict environmental consequences, and were directly relevant to reasonably foreseeable environmental consequences related to an easement across the Tribe's sole source of water, and related impacts on public health, Treaty-protected interests, and cultural resources.

420. Reasonably foreseeable environmental effects and unavoidable adverse effects are material to a final agency action such as a Record of Decision.

421. Despite this evidence, the Corps continued to rely upon assumptions materially similar to those previously challenged concerning detection, shutdown, worst-case discharge, and spill response without adequately explaining why those assumptions reliably represented reasonably foreseeable operating and response conditions at Lake Oahe.

422. Neither the FEIS nor the Corps' 1,167-page Response to Comments meaningfully addressed these criticisms. The Corps did not explain why it continued to rely on the disputed risk methodology, did not reconcile the assumed detection and shutdown performance with the operator's documented record, and did not identify independent evidence establishing that operator-implemented mitigation would perform as assumed.

423. Instead, the Corps irrationally dismissed or inadequately characterized the risk and consequence of the material evidence provided by the Tribe over the course of six years and in direct response to the FEIS in January 2026, ignored the operator's history without addressing its predictive significance, and relied whole-cloth on assurances and analyses supplied by Dakota Access and its retained consultants, including a February 22, 2026 submission noted in the ROD but never provided to the Tribe. ROD at 27.

424. In addition, the Corps also failed to reconcile conclusions in the FEIS with its own records concerning the affected environment at Lake Oahe. The FEIS states that there have been "no changes to the affected environment of surface water since the 2016 EA." FEIS at 3-83. Yet the Corps' own reservoir records document persistent drought and substantially lower reservoir elevations since 2021, producing exposed mud flats, altered shorelines, and impaired access to locations identified in the spill-response plans.

425. This contradiction is material to the Corps' analysis. The existing surface-water conditions bear directly upon the feasibility of accessing boat ramps, control points, and

shoreline response locations, deploying containment and recovery equipment, and implementing the response measures upon which the FEIS relies in evaluating the consequences of a worst case discharge. The Corps neither reconciled its findings with its own reservoir data nor adequately evaluated whether the response plans remain practicable under current conditions.

426. An agency finding contradicted by the agency's own records is the paradigm of arbitrary and capricious action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

427. In the FEIS, the Corps assumes there is an impenetrable aquitard in the strata above the pipeline that would inhibit the movement of oil released from DAPL under the surface, upward into the Missouri River. The record lacks sufficient evidence to support that assumption despite it being material to the Corps' analysis of the potential pathways and consequences of a DAPL release.

428. In the FEIS, the Corps wrote, "[i]n general, this EIS assumes compliance with PHMSA pipeline safety regulations, and that the PHMSA inspection program enforces compliance." FEIS at 3-8. Thus, the Corps relied on assumptions that the operator of DAPL complied with the applicable pipeline safety regulations, rather than taking a hard look at record evidence calling those assumptions into question concerning issues such as a compliant operations, maintenance and emergencies manual, pressurization of the pipeline, integrity management, and facility response planning – all issues in which the operator's own consultant in the 2018 Independent Assessment, and PHMSA (as well as the Tribe) have identified as likely regulatory violations in the operation of DAPL.

429. In the FEIS, the Corps relies on the spill model (Appendix G) for its analysis of the environmental impacts of an oil spill from DAPL. Yet it is acknowledged in the spill model, "[t]he

site specific characteristics used in this DAPL release volume modeling include pipe diameter, flow rate, valve location, the elevation profile along the pipeline, and conservative estimates of leak detection, pump shutdown and valve closure times provided by Dakota Access." FEIS, App. G at 13. In determining the environmental impacts of an oil spill from DAPL, the Corps relies exclusively on information provided by Energy Transfer, and continues to rely on pipeline shutdown times already questioned by this Court.

430. The FEIS's groundwater conclusions — premised on releases too small to detect — likewise contradict the prompt-detection assumptions on which the worst case discharge modeling depends. The agency cannot simultaneously assume near-immediate detection for purposes of minimizing the worst case discharge and prolonged non-detection for purposes of dismissing groundwater impacts. By relying upon unsupported or inadequately explained assumptions, failing to grapple with material contrary evidence undergirding its central analysis, resting on findings that conflict with the record before the agency, and failing to use reliable information concerning reasonably foreseeable spill conditions, the Corps failed to take the required hard look to satisfy NEPA. The Record of Decision and authorization of a new easement is therefore a final agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and issued without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

431. The applicable NEPA regulations define the human environment to include the relationship of people with the natural and physical environment and require consideration of interrelated social and environmental effects. 40 C.F.R. § 1508.14 (2019). NEPA further requires agencies to evaluate the environmental consequences of alternatives on a consistent basis. Id. §§ 1502.14, 1502.16.

432. Section 102(2)(A) of NEPA requires agencies, when implementing the statute, "to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences… in decisionmaking…." 42 U.S.C. § 4332(2)(A).

433. Section 102(2)(C) of NEPA requires that an EIS contain an evaluation of the impacts of a major federal action to the quality of the *human* environment…" (emphasis added). 42 U.S.C. § 4332(2)(C).

434. Where, as with the DAPL FEIS and ROD, "economic or social and natural or physical effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." 40 C.F.R. § 1508.14. The determination of "significance" in NEPA review relies, in part on "the degree to which the proposed action affects public health or safety." 40 C.F.R. § 1508.27(b)(2).

435. The Department of Justice has determined that Native American women over 18 years of age are victims of homicide at more than twice the national average. U.S. Department of Justice, *Federal Law Enforcement Strategy to Prevent and Respond to Violence Against American Indians and Alaska Natives, Including to Address Missing or Murdered Indigenous Persons* 10-11 (2022). https://www.justice.gov/tribal/page/file/1553226/dl?inline. In North Dakota, there are estimates that Indigenous women are ten times more likely to be murdered than the national average. Buffalo's Fire, North Dakota Bills Address MMIP Crisis with Interagency Task Force, Jan. 24, 2025. https://www.buffalosfire.com/north-dakota-bills-address-mmip-crisis-with-interagency-task-force-new-feather-alert

436. In the FEIS, the Corps failed to disclose the positive impacts to the human environment at Standing Rock from the smaller number of oil workers in North Dakota. By failing to take account of the positive impacts to the human environment at Standing Rock from

the smaller number of oil workers under alternatives one and two in the FEIS (the alternatives to shut down DAPL), the Corps understated the benefits of alternatives one and two and overstated the benefits of the selected alternative. The Corps has failed to take the required "hard look" on the public safety and social aspects of the affected human environment.

437. The ROD is arbitrary, capricious, an abuse of discretion and contrary to law within the meaning of the APA, 5 U.S.C. § 706(2)(A), due to the failure by the Corps to take a hard look at the public safety and social aspects of the issuance of an easement for DAPL, including the potential to improve public safety for Native American women on the Standing Rock Reservation and throughout the region.

438. NEPA requires an EIS to rigorously explore and objectively evaluate a reasonable range of alternatives, applying consistent assumptions and scope to each, and to analyze the reasonably foreseeable effects of the proposed action. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14 (2019); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991).

439. In evaluating removal, abandonment, and reroute alternatives, the Corps counted consequences extending beyond the immediate scope of its jurisdiction against those alternatives. Yet when evaluating continued operation, the Corps invoked limitations on its jurisdiction and scope to exclude foreseeable consequences of the selected action. By applying materially different assumptions about the scope of relevant effects depending upon the alternative being evaluated, the Corps distorted rather than objectively compared the alternatives. The Corps applied one scoping logic to disfavor the alternatives and its opposite to favor the proposed action.

440. Before issuing the ROD, the Corps knew that Energy Transfer had publicly announced the Dakota Access North Project, which contemplated transporting approximately 250,000 barrels per day of Canadian crude through DAPL. The characteristics of the crude transported bear directly upon spill fate and response effectiveness, including the effectiveness of the surface-containment and recovery methods upon which the FEIS relies. Rather than analyze that reasonably foreseeable operational change and its implications before authorizing a 25-year easement, the Corps deferred the issue to a future easement condition.

441. The skewed alternatives analysis and the refusal to analyze the reasonably foreseeable transport of Canadian crude each independently violate NEPA. The Record of Decision authorizing the easement is arbitrary, capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Standing Rock Sioux Tribe respectfully requests that this Court:

A. Declare that the Corps violated NEPA, the National Historic Preservation Act, the Native American Graves Protection and Repatriation Act, the Mineral Leasing Act, the Clean Water Act, and the Administrative Procedure Act;

B. Declare that PHMSA's approvals of the 2023 Facility Response Plans for DAPL violated section 311(j)(5) of the Clean Water Act, 49 C.F.R. § 194, and the Administrative Procedure Act;

C. Hold unlawful, set aside, and vacate the Record of Decision authorizing an easement for DAPL to cross Corps-managed lands at Lake Oahe, and remand to the Corps for compliance with applicable law;

D. Hold unlawful, set aside, and vacate PHMSA's approvals of the Facility Response Plans for the DAPL North Response Zone, and remand to PHMSA for compliance with applicable law;

E. Enjoin Dakota Access's reliance upon, and the Corps' implementation of, the unlawful Record of Decision;

F. Pursuant to 33 U.S.C. § 1321(j)(5)(F), enjoin the transport of oil through the Lake Oahe segment of DAPL unless and until a Facility Response Plan that complies with the Clean Water Act and 49 C.F.R. § 194 has been approved and is being complied with;

G. Pending lawful completion of the required reviews, enjoin operation of DAPL at increased capacity, and grant such additional narrowly tailored injunctive relief as is necessary to prevent irreparable harm, in light of the demonstrated history that vacatur alone has not halted the pipeline's operation;

H. Order the Corps to comply with NHPA § 110(k), including by conducting the required investigation, determination, and consultation with the Advisory Council on Historic Preservation before granting further federal approval or assistance;

I. Order the defendants to comply with NAGPRA, including by conducting the required consultation with the Tribe and lineal descendants and preparing and approving a plan of action before authorizing or approving any plan prescribing ground-disturbing response operations on the Federal lands of the Lake Oahe project;

J. Award Plaintiff its reasonable costs and attorneys' fees as authorized by law, including 54 U.S.C. § 307105; and

K. Grant such other relief as the Court deems just and proper.

DATED this 8th day of October, 2026

Respectfully submitted,

*/s/ Jeffrey C. Parsons*

Jeffrey C. Parsons (D.D.C. Bar CO00126)
PARSONS LAW OFFICE
2205 W. 136th Avenue
Suite 106-311
Broomfield, CO 80023
Email: jeff@parsonslawoffice.com
Phone: 720-203-2871

Peter Capossela, *Pro Hac Vice pending*
Attorney at Law
Post Office Box 10643
Eugene, Oregon 97440
(541) 505-4883

Natali Segovia, Esq., *Pro Hac Vice pending*
Executive Director & Senior Attorney
Water Protector Legal Collective
P.O. Box 37065
Albuquerque, NM 87176
602-796-7034
nsegovia@waterprotectorlegal.org

*Counsel for Plaintiff Standing Rock Sioux Tribe*